The MONTANA POWER COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent,

The Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana, Secretary of Interior, Intervenors.

The CONFEDERATED SALISH AND KOOTENAI TRIBES OF the FLATHEAD RESERVATION, MONTANA, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent,

The Montana Power Company, Intervenor.

Nos. 21904, 21767.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1968.

Reargued En Banc Nov. 24, 1969.

Decided July 15, 1970.

Certiorari Denied Jan. 18, 1971.

See 91 S.Ct. 566.

---

Bazelon, Chief Judge, concurred and filed opinion; Tamm, Circuit Judge, dissented and filed opinion, in which McGowan and MacKinnon, Circuit Judges, joined.

MacKinnon, Circuit Judge, dissented and filed opinion in which McGowan, Circuit Judge, joined.

Mr. Charles A. Horsky, with whom Messrs. G. Joseph Vining, Willard W. Gatchell, Washington, D. C., and Joseph A. McElwain, Butte, Mont., were on the brief, for petitioner in No. 21,904 and intervenor in No. 21,767. Mr. John C. Hauck, Butte, Mont., also entered an appearance for petitioner in No. 21,904.

Mr. Richard A. Baenen, Washington, D. C., with whom Messrs. Charles A. Hobbs and Jerry C. Strauss, Washington, D. C., were on the brief, for petitioners in No. 21,767 and intervenors in No. 21,904.

Mr. Peter H. Schiff, Solicitor, Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel at the time the brief was filed, Drexel D. Journey, Asst. Gen. Counsel, William H. Arkin and David F. Storer, Attorneys, Federal Power Commission, were on the brief, for respondent.

Mr. A. Donald Mileur, Attorney, Department of Justice, with whom Mr. Clyde O. Martz, Asst. Atty. Gen. at the time the brief was filed, Messrs. Roger P. Marquis, Attorney, Department of Justice, and George Miron, Associate Solicitor, Reclamation and Power, Department of the Interior, were on the brief, for intervenor in No. 21,904.

Before BAZELON, Chief Judge, WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON and MacKINNON, Circuit Judges, sitting en banc.

LEVENTHAL, Circuit Judge:

These cases involve the readjustment of the annual rentals due Indian tribes for the use of tribal land by a power company in connection with its operation of a hydroelectric project licensed by the Federal Power Commission.

■ For convenience we provide a brief introductory sketch of the central issue: The license issued in 1930 provides for readjustment of rental charges, after 20 years of service, based on the commercial value of the tribal lands for the most profitable purpose for which suitable, including power de-

velopment. In 1930 the pertinent statute provided that the Commission shall fix a reasonable annual charge for the use of tribal lands and that after 20 years of service the "charges may be readjusted * * * in a manner to be described in each license." The particular license provided for adjustment by agreement of the licensee, the Commission and the Secretary of the Interior, or failing agreement by submission to arbitration. In 1935, after the Commission had been reorganized as an independent regulatory agency, the statute was amended to provide that such charges shall be fixed by the Commission, and after 20 years of service, may "be readjusted by the Commission * * * upon notice and opportunity for hearing" and subject to opportunity for judicial review. Montana Power contends that this clause is applicable only to licenses issued subsequent to the 1935 statute. We hold that the 1935 statute, which made no changes in the substantive standard applicable under outstanding license for readjustment of tribal land charges, intended to prescribe the Commission as the tribunal for readjustment under outstanding as well as future licenses. Section 28 of the act, which provides that amendments of the act shall not affect licenses theretofore issued, does not preclude a change in procedure unless there is a showing, which we do not find in this case, that the prior procedure was bargained for as a significant element in the license agreement.

## I. BACKGROUND FACTS AND PROCEDURES

Moving to a fuller statement of the background facts and procedure, we note that the license dated May 23, 1930, was issued to Rocky Mountain Power Company, a wholly owned subsidiary of the present licensee and operator, Montana Power Company ("Company"), for works at Project No. 5, the Kerr Dam, and other facilities of the Kerr hydroelectric project, located at the southern side of Flathead Lake, Montana. The

Company used the lands of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana ("Tribes").[1] The original license for works at Project No. 5 was issued on May 23, 1930, for a term of 50 years, pursuant to the Federal Water Power Act of 1920,[2] and the Act of March 7, 1928.[3]

We defer a more specific reference to pertinent provisions of the license and statutes, and set forth the procedural stance of the controversy.

On May 19, 1959, the Tribes filed with the Commission a petition for readjustment of the rentals, paid by the Company under its license. The license, as issued in 1930, and thereafter amended by the parties, permitted readjustment at this time. In 1965 the Commission set the matter for hearing. Montana Power filed suit in the District Court for Montana to compel compliance with the arbitration provision of the license and for appointment of an arbitrator. That court dismissed, holding that it would not have jurisdiction unless it was held in the proceeding pending before the Commission, subject to review in a court of appeals, that the arbitration provision in the license controlled.

The proceeding before the Commission went forward in 1965, with extensive evidence presented by the Tribes, the Company, the Secretary of the Interior, and the Commission staff.

The Examiner's decision issued on August 4, 1966. On October 4, 1967, the Commission rendered Opinion and Order No. 529. The Commission, which largely agreed with the Examiner, held that the arbitration provision was not controlling, and readjusted the annual charges payable by Montana Power to the Tribes from $238,375 to $950,000, with the increase retroactive to May 20, 1959. Applications for rehearing were filed by the Company and by the Tribes. On November 3, 1967, the Secretary of Interior signified his acceptance of this order, without prejudice to application for rehearing by the Tribes. On March 22, 1968, the Commission entered its order denying rehearing.

A petition to review was filed by the Tribes in this court with respect to one portion of the order (No. 21767). The Company's petition to review (No. 21904) objected to the level of readjusted charges set by the Commission, and also presented a threshold contention that the Commission was without jurisdiction to entertain the proceeding to readjust the charges. A division of this court issued an opinion which ordered the Commission to dismiss the readjustment proceeding for want of jurisdiction. Suggestions for rehearing en banc were filed by the Commission, the Tribes, and the Secretary. This court ordered rehearing en banc, limited to the jurisdictional issue. This court en banc holds that the Commission had jurisdiction over the proceeding, and schedules further proceedings before the court.

1. The Flathead Reservation, consisting of about 1,300,000 acres in western Montana, and including the southern half of Flathead Lake, was created by the Treaty of Hell Gate, July 16, 1855, 12 Stat. 975. The Tribes own the land on which the Kerr Dam and powerhouse are located, as well as the lands underlying the southern half of the Lake. The Lake provides storage capacity at 1,217,000 acre feet.

2. The Federal Water Power Act of 1920, 41 Stat. 1063, 16 U.S.C. §§ 791–823 (1964), generally authorized the issuance of licenses to operate projects for development of power on bodies of water subject to jurisdiction of the Congress or on any part of the public lands and reservations of the United States.

3. The 1928 act, 45 Stat. 200, 212–13, the Interior Department Appropriation Bill, 1929, contained, *inter alia*, a proviso "that the Federal Power Commission is authorized in accordance with the Federal Water Power Act and upon terms satisfactory to the Secretary of the Interior, to issue a permit or permits or license or licenses for the use, for the development of power, of power sites on the Flathead Reservation and of water rights reserved or appropriated for the irrigation projects."

## II. PERTINENT PROVISIONS OF STATUTE AND LICENSE

The license was issued under and in accordance with the provisions of the Federal Water Power Act (*supra*, note 2), which authorized the Commission to issue licenses for the purpose, *inter alia*, of constructing dams, power houses, or other project works, for the utilization of power from bodies of water over which Congress has jurisdiction, or upon any part of the public lands and reservations of the United States (§ 4). Section 6 of the Act provides that licenses shall be issued for a period not exceeding 50 years. The 1930 license established a 50-year term and authorized construction of three generating units aggregating not less than 150,000 hp. to be completed within three years.

Section 10 provides that all licenses shall be on certain prescribed conditions. Subsection (e) relates to charges payable by the licensee. The provisions relating to what might be called the usual fees charged by the Commission, for administration and for use of Government property, are not involved in this case; indeed they were waived for the project by the 1928 law (*supra*, note 3). What is particularly before us is a proviso of § 10(e) that refers to the special case of a user charge payable "when licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations." As enacted in 1920, this proviso continued—"the commission shall fix a reasonable annual charge for the use thereof, and such charges may be readjusted at the end of twenty years after the beginning of operations and at periods of not less than ten years thereafter in a manner to be described in each license."

The license issued in 1930 by the Commission, which then consisted of the Secretaries of War, Interior, and Agriculture (*see* 41 Stat. 1063), contained terms which had received the specific approval of the Secretary of the Interior as required by the special 1928 law pertinent to the Flathead Reservation tribal lands (*supra*, note 3). Article 30(A) set forth the annual charge as a flat fee, rising in amount from $60,000 in the first two years, through various steps, reaching $175,000 per year for the 16th—20th years "and/or until readjustment" pursuant to (D). Article 30(D) provided for readjustment of annual charges after 20 years (1) by mutual agreement between the Commission and the licensee, with the approval of the Secretary of the Interior, or (2) failing that, by arbitration in the manner provided for in the United States Arbitration Act, 9 U.S.C. § 1 ff. (1964).

Article 30(D) further set forth as the governing criterion—"such readjusted annual charges to be reasonable charges fixed upon the basis provided in Section 5 of Regulation 14 of the Commission, to wit, upon the commercial value of the tribal lands involved, for the most profitable purpose for which suitable, including power development."

When Congress passed the Public Utility Holding Company Act of 1935, it retained the Federal Water Power Act of 1920 as Title I of the Federal Power Act.[4] Most of the provisions of the 1920 law were carried over wholesale, but there were a few changes. Specifically, the proviso of § 10(e) for licenses involving Government dams or tribal lands within reservations, was amended, as indicated in the footnote,[5] so as to read that—

> (e) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of this Part; for recompensing it for the use, occupancy, and enjoyment of its lands or other

4. Act of August 26, 1935, 49 Stat. 838; *see* 16 U.S.C. § 791a *et seq.* (1964), *as amended* (Supp. IV, 1969).

5. As amended in 1935, the law provides:
§ 10. All licenses issued under this Part shall be on the following conditions:

Note 5—Continued

property; and for the expropriation to the Government of excessive profits until the respective States shall make provision for preventing excessive profits or for the expropriation thereof to themselves, or until the period of amortization as herein provided is reached, and in fixing such charges the Commission shall seek to avoid increasing the price to the consumers of power by such charges, and any such charges may be adjusted from time to time by the Commission as conditions may require: *Provided,* That when licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations the Commission shall, subject to the approval of the Secretary of the Interior in the case of such dams or structures in reclamation projects and, in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 16 of the Act of June 18, 1934 (48 Stat. 984), fix a reasonable annual charge for the use thereof, and such charges may with like approval be readjusted by the Commission at the end of twenty years after the project is available for service and at periods of not less than ten years thereafter upon notice and opportunity for hearing: *Provided further,* That licenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit or is used by such State or municipality for State or municipal purposes, except that as to projects constructed or to be constructed by States or municipalities primarily designed to provide or improve navigation, licenses therefor shall be issued without charge; and that licenses for the development, transmission, or distribution of power for domestic, mining, or other beneficial use in projects of not more than two thousand horsepower installed capacity may be issued without charge, except on tribal lands within Indian reservations; but in no case shall a license be issued free of charge for the development and utilization of power created by any Government dam and that the amount charged therefor in any license shall be such as determined by the Commission. In the event an overpayment of any charge due under this section shall be made by a licensee, the Commission is authorized to allow a credit for such overpayment when charges are due for any subsequent period.

As originally enacted in 1920, § 10 (e) provided:

(e) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the commission for the purpose of reimbursing the United States for the costs of the administration of this Act; for recompensing it for the use, occupancy, and enjoyment of its lands or other property; and for the expropriation to the Government of excessive profits until the respective States shall make provision for preventing excessive profits or for the expropriation thereof to themselves, or until the period of amortization as herein provided is reached, and in fixing such charges the commission shall seek to avoid increasing the price to the consumers of power by such charges, and charges for the expropriation of excessive profits may be adjusted from time to time by the commission as conditions may require: *Provided,* That when licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations the commission shall fix a reasonable annual charge for the use thereof, and such charges may be readjusted at the end of twenty years after the beginning of operations and at periods of not less than ten years thereafter in a manner to be described in each license: *Provided,* That licenses for the development, transmission, or distribution of power by States or municipalities shall be issued and enjoyed without charge to the extent such power is sold to the public without profit or is used by such State or municipality for State or municipal purposes, except that as to projects constructed or to be constructed by States or municipalities primarily designed to provide or improve navigation licenses therefor shall be issued without charge; and that licenses for the development, transmission, or distribution of power for domestic, mining or other beneficial use in projects of not more than one hundred horsepower capacity may be issued without charge, except on tribal lands within Indian reservations; but in no case shall a license be issued free of charge for the development and utilization of power created by any Government dam and

the Commission shall, subject to the approval of the Secretary of the Interior in the case of such dams or structures in reclamation projects and, in the case of such tribal lands, subject to the approval of the Indian tribe having jurisdiction of such lands as provided in section 16 of the Act of June 18, 1934 (48 Stat. 984)—fix a reasonable annual charge for the use thereof, and such charges may with like approval be readjusted by the Commission at the end of twenty years after the project is available for service and at periods of not less than ten years thereafter upon notice and opportunity for hearing.

Section 28 of the Act,[6] which was not changed, provides:

> The right to alter, amend, or repeal this Act is hereby expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this Act, or the rights of any licensee thereunder.

## III. CONSIDERATIONS UNDERLYING THE COURT'S CONCLUSION OF APPLICABILITY TO EXISTING LICENSES OF COMMISSION READJUSTMENT PROCEDURE PRESCRIBED IN 1935 AMENDMENTS.

It is the 1935 provision for readjustment of annual charges "by the Commission" that was invoked by the petition of the Tribes filed with the Commission in 1959, and by the Commission in its order of readjustment of charges that is brought here on petition to review. Montana Power claims the 1935 readjustment provision is inapplicable because, when the original license was issued in 1930, the statute provided only for readjustment of charges "in a manner to be described in each license." It appeals to § 28 of the Act as showing the Commission is without jurisdiction to readjust charges. It says this conclusion is required in order to avoid a constitutional and statutory thicket.

### A

The 1920 Act marked a change in national policy, a Congressional determination to go beyond merely forbidding obstruction to navigation and to achieve instead a comprehensive development of national resources. But it was marred by deficiencies in administration and implementation. And so changes were made in 1930 and 1935. Niagara Mohawk Power Co. v. FPC, 126 U.S.App. D.C. 376, 378, 379 F.2d 153, 155. The 1930 change was one whereby the Commission was reorganized and became an independent regulatory commission, instead of a committee of cabinet officers —the Secretaries of War, Agriculture and Interior.[7]

As to the 1935 law, the pertinent committee reports show that the changes in § 10(e) are intended to make explicit that readjustment of charges imposed by the Act "shall be made by the Commission." The Senate Report [8] states:

> Several minor changes are made in section 10(e), relating to the charges to be paid by licensees. The charge to

---

Note 5—Continued

that the amount charged therefor in any license shall be such as determined by the commission.

6. 16 U.S.C. § 822 (1964).

7. Act of June 23, 1930, 46 Stat. 797.

8. S.Rep.No.621, 74th Cong., 1st Sess. 45 (1935).

The subsequent House Report, H.R. Rep.No.1318, 74th Cong., 1st Sess. 24 (1935) is virtually identical. The pertinent paragraph reads:

There are several minor changes in section 10(e) relating to the charges to be paid by licensees. The amount to be fixed for the purpose of reimbursing the United States for the cost of administration is limited to the present amount by the provision that the base is the cost of administering this part of the act, not the entire act, which would include the new parts II and III. The Commission's authority to adjust all charges from time to time is made express. *It is also made clear that the adjustment of charges for li-*

be fixed by the Commission for the purpose of reimbursing the United States for the cost of administration is limited to the cost of administering this part of the act, instead of the entire act. This makes no change in the present situation, but confines the charges to those needed for the administration of the water-power provisions. The amendment also makes explicit the authority of the Commission *to adjust from time to time all charges imposed under the act.* In the proviso that charges for licenses involving the use of Government dams shall be adjusted at the end of 20 years, there is introduced for the purpose of clarification the provision that *such readjustment shall be made "by the Commission"*; this time is to run from the time "the project is available for service" instead of from the beginning of operations, as the latter date is subject to postponement by the licensee. Finally, the Commission is authorized to allow a credit for any overpayment of charges which may have been made in preceding years. [Emphasis added.]

Licenses involving use of tribal lands are in the same proviso, of course, as licenses involving the use of government structures.

■ So far as can now be gleaned, from the briefs of counsel and our own researches, Congress did not expressly address itself to the issue of the applicability of the amended § 10(e), providing for Commission readjustment, to the problem of a pre-existing license containing a procedure for readjustment solely by agreement or arbitration. The court is unable, then, to discern any specific legislative intent, one way or the other, as to the precise issue now before us.

That being the case, the court must discern the applicable legislative intent by what is necessarily an act of projection—starting from the areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before us.[9]

The question is by no means an easy one. We must consider what basic pattern of administration of § 10(e) was likely to have been foreglimpsed by the legislature. We must take into account that the legislature described its changes as "minor," and that the Company considers the replacement of a court-selected arbitrator by a federal commission as a change that is far from minor and adversely affects its "rights" under the license which § 28 of the act solemnly protects. We must consider the constitutional aura of the Company's contentions, and fundamental considerations of fairness.

Taking these various elements into account, our effort to discern applicable legislative intent leads us to these conclusions:

First, § 28 protects the licensee from any change in, and the legislature did not intend to authorize any change in, either the substantive duties or rights of the licensee as already determined, or any of the criteria or standards specified for the license. This much the Commission concedes, and it has already made clear that the annual charges specified in pre-1935 licenses are not subject to increase. Annual Charges Payable by Licensees, 31 F.P.C. 1555 (1964).

*censes involving the use of Government lands shall be made "by the Commission";* the time of such adjustment is calculated from the time the project is available for service, instead of from the beginning of operation; and the Commission is authorized to allow a credit for any overpayment of charges that may have been made in preceding years. [Emphasis added.]

9. *See* City of Chicago v. FPC, 128 U.S. App.D.C. 107, 113, 385 F.2d 629, 635 (1967); Eastern Air Lines, Inc. v. CAB, 122 U.S.App.D.C. 375, 379, 354 F.2d 507, 511 (1965); *see also* Gray, The Nature and Sources of the Law 173 (1963 ed.); Cordozo, Nature of Judicial Process 15 (1921).

Second, *in general,* so far as matters of procedure are concerned, the amendments were intended to be applicable to all determinations made subsequent to the date of amendment. In general, we conclude that changes in the tribunal or forum for making (readjustment) determinations were intended to be applicable to all subsequent determinations.

Third, the legislative intent expressed and preserved in § 28 establishes an exception in the case of any specific license for which the prior procedural system had either been bargained for as a right or had otherwise been established as a matter of such importance that its removal raised problems of fairness. We do not find this kind of specific exception available in the case before us.

Fourth, we think this view of the statute fully preserves the Company's constitutional rights and guarantees.

### B

We proceed now to a fuller discussion of these manifestly inter-related propositions.

Our view of both the statutory scheme and constitutional requirements is supported by Pennsylvania Power & Light Co. v. FPC, 139 F.2d 445 (3d Cir. 1943), cert. denied, 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086 (1944). There the company contended "that the Federal Water Power Act, under which the license was granted, did not entrust the Commission with control of the licensee's capital accounts, but merely of the project accounts and that even as to project accounts final determination of project cost or net investment was entrusted by the original act to the district court rather than to the Commission." The court disagreed and in its opinion, written by Judge Maris, said (at 453):

We see no merit in these contentions. \* \* \* [T]he licensee had no vested right to have its investment determined by one procedure rather than by another at least ,so long as it was accorded a right to be heard and an ultimate judicial review. Accordingly the change of procedure which the 1935 amendment brought about did not, as applied to the present proceeding, violate the Fifth Amendment. Crane v. Hahlo, 1922, 258 U.S. 142, [42 S.Ct. 214, 66 L.Ed. 514].

The court considered no additional discussion necessary insofar as the contention of Pennsylvania Power & Light —that there was a prohibition against use of the new forum (Commission rather than District Court) and procedure specified in the 1935 act—was rested on § 28 of the Act as well as constitutional considerations.

Pertinent precedents include Crane v. Hahlo, 258 U.S. 142, 42 S.Ct. 214, 66 L. Ed. 514 (1928), cited by Judge Maris, and Hardware Dealers' Mutual Fire Ins. Co. v. Glidden Co., 284 U.S. 151, 159, 52 S.Ct. 69, 76 L.Ed. 214 (1931), wherein Justice Stone relied on *Crane.*

▆ These precedents show that when all that is involved is a change in tribunal, when a determination by a court is replaced by a final determination, subject only to limited court review, of a board of officials (*Crane* and *Pennsylvania Power & Light*) or arbitrators (*Glidden*), the change in remedy does not partake of impairment of "vested rights." These precedents establish that the legislature's substitution of arbitration for a commission, or vice versa, is a permissible change of remedy (assuming limited judicial review) and does not constitute a general alteration of rights not fairly subject to divestment.[10]

10. Although there are of course differences in the types of matters referred to arbitrators or official boards, the principles permitting substitution of one mechanism for another would not seem affected by the circumstance that what is involved is a determination of fair rental value, as in the case at bar, or damages from street improvements, as in Crane v. Hahlo, or of amount of loss suffered from a fire, as in the *Glidden Co.* case.

Any contention that there is a right to a determination by an official appointed by the court, rather than officials

So far as constitutional problems are presented by the issue whether a legislature's change in arbitration remedy is applicable to contracts previously entered into, the applicable jurisprudence may appropriately be found in, *e. g.,* Berkovitz v. Arbib & Houlberg, Inc., 230 N.Y. 261, 262, 130 N.E. 288, 290 (1921) wherein Judge, later Mr. Justice, Cardozo said:

> Arbitration is a form of procedure whereby differences may be settled. It is not a definition of the rights and wrongs out of which differences grow. This statute did not attach a new obligation to sales already made. It vindicated by a new method the obligation then existing.

In § 28 Congress gave assurance that it would not make any amendment that "shall affect any license theretofore issued * * * or the rights of any licensee thereunder." We do not think § 28 was intended to preclude change in remedy and procedure on the ground that they necessarily "affect" the vindication of the license, even though, as every lawyer knows, available procedure may make a difference in result, *e. g.,* whether he has pre-trial or pre-hearing discovery. We do not think it is the fair intendment of Congressional will to read § 28 so broadly as to constitute a general prohibition against changes in the procedure or machinery applicable to a license, changes that do not have the quality of changing substantive rights or obligations.

As to licenses involving use of either Government dams or lands of Indian tribes we think that the 1935 insertion in § 10(e), expressly putting the function of readjustment of rentals in the hands of the commission, applies to the generality of all such licenses outstanding.[11] The only effect of § 28 is to carve out an exception for those cases where the prior-established procedure had the quality of a substantive "right," *e. g.* in instances where specifically bargained for by the licensee, a matter that we shall separately consider under part III, C of this opinion.

Reverting to the general interpretation of § 10(e) we must bear in mind that any of the constructions presently contended for by the parties before us still leaves § 10(e) as involving only a "minor" change—as compared with the context of the far-reaching changes in national power policy wrought by this law, the Public Utility Act of 1935. The construction we think proper for §§ 10(e) and 28 gives application to this statute of the general principle that a prescription of procedure or machinery (and here the explicit designation of the tribunal assigned with decisional responsibility), is to apply across the board to all matters later set for decision, whether under new or existing licenses. We see no basis for concluding that the applicability of this general rule is negatived by either express language or the power of an inference from context.

Montana Power says that the substitution of a commission for an arbitrator

---

nominated by the President and confirmed by the Senate, verges on the trivial, and is in any event answered by the *Pennsylvania Power & Light* decision. That company's reliance on § 28 of the Act was advanced at p. 41 of its brief to the 3d Circuit according to a statement in the Commission brief not contested by the Company. It is notable that Crane v. Hahlo upheld transfer of function from a court to a board of officials of the very city against which the claim was made, appointed by the mayor.

11. During fiscal year 1935 the Government collected fees from licensees for the use of federal dams and lands of Indian tribes totaling $218,185.39. (This is exclusive of fees paid by licensees who used public lands and national forests.) These amounts were paid pursuant to 36 outstanding licenses involving either land of Indian tribes or Government dams; seven of these licenses involved payments in excess of $1,000.00 (the amount payable under Project 5 during the construction period). Fifteenth Annual Report of the Federal Power Commission 37–45 (1935).

can hardly be called "minor." The word must be considered in context. The Public Utility Act of 1935 wrought far-reaching changes in national electric power policy, not only the famous "death sentence" for public utility holding companies, but also in Title II, a substantial extension of the Commission's jurisdiction. Instead of limitation to hydroelectric projects in navigable streams (and Federal lands) the Commission was given regulatory control over interstate activities of operating electric utilities, and Congress also set up machinery for Federal assistance to State regulatory commissions. It is in this context that we must consider the change made in § 10(e), which had previously provided that charges be set by the commission and "readjusted in a manner described in the license." This language had been stretched to provide not only a manner for readjustment of charges (which would have included, say, a readjustment formula) but also a change in locus of responsibility for prescribing charges, to a person or agency other than the commission.

Whatever reasons may have impelled use of another agency prior to 1930 when the commission consisted of three busy cabinet officers and had conflict-of-interest type problems,[12] in 1930 the Congress reorganized the commission as an independent regulatory agency. The statutory revision made clear that the decisional responsibility assigned to the commission embraced not only the original charge but the readjustment of charges. In another context this change might have prompted more elaborate consideration and discussion. In the context of the far-reaching changes in the 1935 legislation it is not hard to see why the change was described as a minor clarification.

The context of the present statute gives further support to the general presumption for across-the-board application of procedures by virtue of the fact that otherwise different procedures and tribunals would be required for different aspects of the same project, or for plainly inter-related projects. This is not a merely theoretical consideration. As this court has pointed out with respect to Montana Power's existing project on the site obtained from the Tribes —"The Commission does not necessarily license all the project works of a given project at one time." *Montana Power Company v. FPC*, 112 U.S.App.D.C. 7, 11, 298 F.2d 335, 339 (1962).[13] The Company conceded, and could hardly deny, that as to the new post-1935 license which it obtained from the Commission (*see* note 13 *supra*), responsibility for adjustments rests solely in the Commission. There is no reasonable basis for supposing that the legislature would have intended to assign responsibility in part to the Commission and in part to an arbitrator. As appears from the experience in 1929 and 1930, the calculation of user charges and determination of the value of the site comes to involve, *e. g.*, calculating cost of horsepower produced there and making comparison with alternatives, determination of the share properly applicable to the land owned by the Indians and to the Lake waters, and determining the extent of Lake water value to be attributed to the Indians (the Lake waters being owned

---

12. The Secretary of Interior was not only guardian of the Tribes affected by projects on Indian reservations, but was also head of the department that contained the Bureau of Reclamation interested in projects using Government dams. The Secretary of Agriculture headed a department containing the Forestry Service responsible for lands used in electric projects. The administration of Commission licenses involved problems of irrigation and reclamation.

13. That case involved the circumstance that the 1930 license was amended to provide for two units. After construction of these was completed, in 1949, Montana Power constructed and in 1954 began operating a Third Unit, albeit it had not obtained requisite licensing authorization. The Commission amended the Kerr license nunc pro tunc in 1961, and required annual payments of $63,375 for additional use of Tribal lands from 1954.

in part by the Indians and in part by the State). In these and other matters it cannot fairly be presumed that the legislature contemplated responsibility assigned in part to the Commission and in part elsewhere, with the possibility of conflicting approaches tending to hamper rather than attain a fair result.

Uniformity of administration of federal water power permissions was, after all, the reason why in 1920 there was gathered in a single (cabinet-level) commission the different jurisdictions theretofore exercised by the War Department, which controlled the developments in navigable waters, the Department of Agriculture, which controlled the power sites located in the extensive mountainous regions in the national forests, and the Department of the Interior, which administered the projects on Indian reservations and public lands. It would be an anomaly indeed if the 1930 transfer of functions to an independent commission, as the increasing number of projects and problems demanded excessive time of cabinet members, followed by the 1935 enlargement of functions entrusted to that commission, were to be interpreted to require a dispersion rather than a centralization of responsibility for those functions.

Our approach does not assume for a moment that the availability of arbitration is a matter of only trivial consequence. It is important enough to be unaffected by the accident of diversity of residence of the parties and the fact that diversity permits removal from an ordinary state court to a federal court (which is treated in diversity cases as a particular kind of "state" court). Bernhardt v. Polygraphic Co., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). But this conclusion, as is plain from *Bernhardt*, does not depend on whether the right to arbitration is labeled as either a substantive "right" or a matter of procedure.

While the availability of arbitration may not turn on an accident of forum within a state, it certainly may properly be affected by the legislature's subsequent establishment of a different and appropriate procedure as exclusive. We refer again to Judge Cardozo's opinion in Berkovitz v. Arbib & Houlberg, Inc., *supra*.

### C

We have carefully considered, and we reject, Montana Power's alternative contention that in this particular license the arbitration provision had been "bargained for as a major element in the agreement, and [is] hence a vested right" which Congress could not and did not take away.

The materials cited to us reveal that there was considerable study and negotiation over the amount of annual rentals that would be fair to the Tribes, and whether they should be on a flat basis or depend on actual use of facilities. A flat schedule was finally agreed to.

There is no showing by the Company that arbitration was "bargained for", or that this was anything more than a convenient way of providing for readjustment of rentals by an objective tribunal in case the parties could not agree.

The record contains, and we have examined, Flathead Power Development, Memorandum on the Development of Flathead River Power Sites, Montana, Sen.Doc. 153, 71st Cong., 2d Sess. (1930) (hereafter referred to as Sen.Doc.). The Senate Document contains a memorandum dated December 30, 1929, by J. Henry Scattergood,[14] Assistant Commissioner, Bureau of Indian Affairs, addressed to the Secretary of Interior Wilbur and the Federal Power Commission pertaining to the two pending applications for development of Flathead River Power sites—one from Rocky Mountain Power Company, and one from Walter H. Wheeler. This memorandum concluded that both applicants had made inade-

---

14. This memorandum appears in Sen.Doc. 1–47. Our review also draws on his supplemental memorandum dated May 14, 1930 addressed to Secretary Wilbur, Sen. Doc. 49.

quate offers of Indian rentals—a view later supported by a separate Army study made at the request of Secretary Wilbur and of the Commission.[15] The context of further negotiations is focused by observations in this memorandum, which may be set forth as follows:

The Flathead case was of great importance to the Indians in establishing principles. The Federal Power Commission, Secretaries of War, Agriculture and Interior, had a new executive secretary and new general counsel. Two Senators and two Congressmen addressed the Commission at its hearings. Special care had to be taken because in addition to the interests of the licensee and the "general consuming public," the only two parties normally involved in power site leases under the Federal water power act, consideration had to be given to the interest of "the Indian tribe, which is entitled to a fair rental for the use of the power sites."

A license to Mr. Wheeler, a civil engineer of good standing and excellent record of accomplishment, would provide "development advantages" of attracting new industries to the region, which would be in competition with the Anaconda Copper interests closely allied with Montana Power. (Sen.Doc. 3, 46–47.)

Wheeler offered $1.125 per horsepower-year, which would yield $118,125 annual rental for Site 1 on an estimate of 105,000 hp., a high efficiency ratio and a 100% utilization factor. The Company offered $1 per horsepower-year. It estimated 20,000 hp. for Site 1, and a utilization factor of only 85% reducing hp. produced to only 68,000 hp., and average "spot" rental of only $68,000.[16]

However, Mr. Wheeler's payments were seen to be limited by the fact that his costs were in the same range as those of the Company (close to $14 per horsepower year). Moreover, Wheeler's selling price could not exceed $15 to attract new industry (perhaps $16.34 to

Mountain States Power), and this could leave no room for the Indians to seek a higher rental (Sen.Doc. 29, 32). Rocky Mountain Power on the other hand had an intercompany price of $18, an advantage to the Indians (Sen.Doc. 32). The Montana Power System had an immediate need for capacity (indeed had had a shut down due to a recent dry season), and the Flathead site represented the optimum site available to the Company, with the cheapest power at the powerhouse and largest volumes (Sen.Doc. 4–5).

Accordingly the Indian Bureau put forward the view that the economic rental value of the site should be expressed as the difference between the generating cost of service (including fair return to the Company), and the intercompany price, and this amount should be divided between the Indians and the general public in proportion to their respective interests, the Indians owning the land sites and the part of the Lake within the reservation, and the State of Montana owning the rest of the Lake and the right of water use. Assuming the Indians' interest as 50% (rounding out a calculated 46.5%), this would yield the Indians $2.25 per horsepower, on an annual average of 80,500 hp. (Sen.Doc. 9, 34). And the possibility of increased rentals was heightened by the Company's statements at the hearing that the $1 offer was a "nominal" and "arbitrary" offer, based on the fact that this was the customary charge of the Forest Service—which had no trust obligations to the Indians (Sen. Doc. 37).

So much for Scattergood's memorandum dated Dec. 30, 1929. The Senate Document reveals that there then ensued four months of discussion in 1930 on the basis of a different approach—a combination of fixed charge and energy charge. Mr. Scattergood's May 14, 1930 supplemental memorandum to Secretary Wilbur[17] notes that several plans were

---

15. Sen.Doc. 49.

16. Sen.Doc. 12–13, 14 (table), 50.

17. Sen.Doc. 49 et seq.

put forward with this type of schedule: one by the Commission in its schedule of January 2, 1930; one by the Army engineers, on an independent study requested by Secretary Wilbur, submitted February 27, 1930, and revised March 20, 1930; and one by the Indian Bureau, in its Schedule 2, dated April 1, 1930, discussed by the Secretary with the Montana delegation. The approach of minimum fixed rental to a given horsepower development, plus an energy charge above that point, amounted to a profit-sharing contract that gave the Indians large revenues at high output and the risk of too little at low brackets. Mr. Scattergood's analysis continues (Sen. Doc. 51):

> Furthermore a number of difficulties were encountered in all these profit-sharing plans in providing against any possibility of the use of the Flathead plant for peaking purposes only or in dull times the giving to it of only a reduced proportion of the entire system load, and in general the avoiding of the temptation to starve this plan in order to reduce the Indian rental. Four months of negotiations were consumed in discussing those various plans and the variables upon which they were based and we were never able to reach an agreement. Several deadlocks actually developed with the breaking off of negotiations. Finally efforts on these lines were abandoned and a new approach was entered upon with the plan of a flat rental.

And so a flat rental basis was finally agreed to. It reduced risks to the Indians. And it avoided involvement by the Indians with having to monitor the management of the hydroelectric project. As Mr. Scattergood puts it, the flat rental approach "avoids the difficulties of assuring to the Flathead plant its fair proportion of system load" and "avoids any inducement that Flathead be used for peaking purposes, or that it be starved unduly at high water periods when other plants of the system could carry an increased share of the load." (Sen.Doc. 51–52.)

With this change in approach to a flat rental schedule [18] the problem of readjustment of rentals, which had previously been visualized as in the nature of implementation of a predetermined formula with new operating data, now became an open-end agreement to negotiate and submit to arbitration. The Company's brief notes (pp. 15–16) that this proposal was made by the Secretary of the Interior and promptly agreed to by the Company and the Commission. This recourse to arbitration was in the context of an open-end agreement, with the parties simply unable to agree on a "formula" approach for rentals that would not excessively monitor or trammel corporate management, yet would be

18. The schedule agreed on by the parties and contained in the license is:

| | |
|---|---|
| For the first two years | $ 60,000 per year |
| " " third year | 75,000 " " |
| " " fourth " | 100,000 " " |
| " " fifth " | 125,000 " " |
| For the next five years | 150,000 " " |
| " " " " " | 160,000 " " |
| " " " " " and/or until readjustment of the annual charges payable hereunder shall have been effected pursuant to the provisions of paragraph (D) of this Article 30 | 175,000 " " |

fair to the Indians.[19] The readjustment of flat fee rentals could not be left either to the Company, or to the Secretary of the Interior, or to the Commission of which he was a member.

After the issuance of the license in 1930, however, Congress reorganized the Commission.[20] It no longer had the Secretary of the Interior or any other Cabinet officer as a member. They, it appeared, had been "so burdened with the tasks of their immediate departments that they have not had the time necessary for the work of the commission."[21] Indeed the Commission was no longer confined to the partisan membership of the appointees of one Presidential administration. It was established as a conventional independent regulatory five-man commission, bi-partisan, with staggered terms. It was organized as a full-time commission with full-time, expert staff. By the time of the amendments to § 10(e) as part of the Public Utility Act of 1935, the Federal Power Commission's status as an independent regulatory commission with expertise was a matter of some years' duration, and its standing was reflected in the 1935 law, which significantly enlarged its jurisdiction.

The record does not provide the affirmative showing necessary to support a claim that the interposition of the Commission in this case would violate § 28, as taking away the essence of a bargained-for right. What the parties bargained about for months was the attempt to reach a demand-plus-energy schedule, and this was abandoned. With the adoption of a flat rental schedule, all parties were in agreement on the need

---

19. The Company's brief is skillful but wholly unwarranted insofar as it makes, and seeks to gain some support from, this statement (at Br. 18): "The Commission's proposal included a provision that would have given it somewhat the same jurisdiction over readjustments that it now asserts. Report, p. 63, R. ref. 8291. Its proposal was not adopted."

These are the facts shown in the record. First, both applicants put forward a rental schedule of a specified fixed rate per horsepower produced, which had been estimated at a "spot" of production. (Sen.Doc. 49.) This approach was rejected.

Next, a number of rental plans were put forward, which contained a "Combination of a fixed rental plus an energy charge." There was a plan put forward by Army engineers; and a plan initiated in the Indian Bureau. The first proposal for such a plan appears in a memorandum dated January 2, 1930, prepared by F. E. Bonner, executive secretary of the Commission. (a) This was a personal memorandum, as appears from his reference to "my judgment" of development cost (Sen.Doc. 60). (b) The memorandum was tentative, to stimulate discussion of the fixed rental plus energy charge approach. "In the event the Commission decides to authorize a license for site 1 in the above case, it appears that the following may offer a rough outline of a logical method for determining the reasonable charge to be fixed for the use of the Indian land. * * * While merely tentative and probably embracing some defects, it should at least be helpful in offering something tangible for further study and discussion." (Sen. Doc. 59, 61.)

The "fixed rental plus energy charge" was rejected because of the problems of encroachment on the Company's managerial discretion, and fluctuation in income for the Tribes. It was because of these difficulties that four months negotiations led to deadlock, with negotiations broken off, and then a decision to embark on the new approach of flat rental. Sen. Doc. 51, quoted in opinion, *supra.*

This solidly documented history shows that the parties simply could not agree on initial rentals, for the first 20 years, on a "fixed rental plus energy charge" approach.

There is absolutely no basis for conjecturing whether, if the parties could have gotten together on the initial approach for the first 20 years they would have been unable to agree on the subsidiary concept, also proposed by Mr. Bonner, but without any discussion, of entrusting to the Commission the task of making the readjustment to apply the basic approach agreed on for the first 20 years to the subsequent period. There is certainly not the slightest basis for hinting that such Commission readjustment was not acceptable to the Company.

20. Act of June 23, 1930, 46 Stat. 797.

21. Sen.Rep. 378, 71st Cong., 2d Sess. 2.

for an objective means of determining readjustment charges if the parties were unable to agree. The device of providing for agreement, and arbitration in the event of inability to agree, was simply the conventional device used by business contractors to obtain an on-going agreement and the assurance of an objective tribunal without a special economic interest. As such it does not differ significantly from the device of setting a reasonably definite standard, as the parties did in this case,[22] and leaving application of the standard to the courts if the parties themselves could not later agree on its application.[23]

We see nothing in the negotiations, or in the license itself, to suggest that the arbitration provision was more than simply a means of achieving the goal of impartial application of the general standard embodied in the license. This was the goal, too, of § 10(e), and whether the change of forum was from the District Court to the Commission, as in *Pennsylvania Power & Light, supra,* or from an arbitrator appointed by the District Court to the Commission, as in the case at bar, the essential purpose of both Congress and the parties to the license agreement is satisfied by our interpretation. All that is changed is the tribunal: from a court-appointed arbitrator under this license (perhaps from a court itself under another license) to an independent, bi-partisan expert commission subject to judicial review. The Commissioners were by law precluded from engaging in any other business or employment, or from holding any official relation to any license or any pecuniary interest therein. 16 U.S.C. § 792 (1964).

There is no specific indication in the record why the parties preferred an arbitrator appointed by the court to decision directly by a court. Traditional reasons would include the greater speed, informality, and flexibility of the arbitral process. The same factors were generally considered in 1935 to attach to the expert independent commission. Perhaps there was a disinclination to take the risk that the readjustment language might be thought too indefinite to be enforceable by a court (compare note 23, *supra*); this risk would not be applicable either to an arbitrator or the Commission. These traditional reasons for arbitration certainly provide no basis for interposing § 28 as a mandate to carve an exception out of the across-the-board procedure set forth in § 10(e). And that disposes of the case before us in view of the absence of a showing of any other reason why the parties chose arbitration—the kind of reason that would be significant enough to warrant application of the kind of protection afforded by § 28 to substantive rights and would be frustrated by the procedure specified in § 10(e).

So far as this case is concerned the members of the Commission did not have the disqualification formerly attaching to the Secretary of the Interior as special guardians of the Indian tribes. The Commission was established as an agency with broad stewardship over various aspects of the public interest—including sound development of water resources, and concern for the general consuming public—as well as the function and capacity for fair treatment of individual parties before it, whether licensees or Indian landlords. Looking to the essence of the situation, we see no showing that the designation of this commission as the body to determine readjustment of rentals under the outstanding licenses derogates from rights safeguarded by § 28 of the act.

## IV. OTHER MATTERS

1. To avoid misunderstanding we emphasize that we are not casting doubt

---

22. The license provides that the "readjusted annual charges [are] to be reasonable charges fixed upon * * * the commercial value of the tribal lands involved, for the most profitable purpose for which suitable, including power development."

23. See Corbin on Contracts § 99 (1963). There are decisions that may be read as indicating that such a standard is too indefinite for judicial enforcement, but they apparently constitute a minority view.

on the authority of this commission, or other regulatory agencies, to take account of efforts of parties to settle differences by agreement or arbitration.

The flexibility that is part of the genius of administrative law and procedure may warrant an agency's staying its proceeding while the parties negotiate toward a settlement agreement, or while their arbitrators grapple with the matter. The award would have the same legal significance as an agreement between the parties. *Compare* Brotherhood of Railroad Trainmen v. Akron & B.B.R.Co., 128 U.S.App.D.C. 59, 74, 385 F.2d 581, 596 (1967), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 19 L. Ed.2d 983 (1968). This would at the very least be a strong "advisory" effect, and in practical terms it might permit the commission to grapple much better with its prodigious work load.

This kind of flexibility, like the commission's use of negotiated settlements, takes account of the significant difference between these two approaches in the settlement of controversies. An administrative agency, like a court, depends on reasoned disposition, on application of general rules and standards to the facts of a particular matter. Arbitration may proceed by that judicial type of disposition, but it may also partake of the kind of consensual disposition which prevails among businessmen, or in the relations between business and labor, and for that matter even in the halls of the legislature. Arbitrators do not have to give reasons.[24] In some types of matters that may be an advantage. It is commonplace that parties may be able to agree on a particular result more readily than they can agree on a statement of the general approach that harmonizes with the particular result. "The parties may be disposed to avoid the expense and distractions of litigation if the various rates reached in a settlement do not constitute a binding admission or ruling on principle." City of Chicago v. FPC, *supra*, 128 U.S.App.D.C. at 119, 385 F.2d at 641.

These considerations point to the possibility that a commission might properly conclude that for certain issues the public interest is better served by limiting devotion of the time, staff, and resources of an adjudicatory independent regulatory commission, and by providing more scope for agreement of the parties (including arbitration).[25] But such a judgment made by a commission on assessing all the factors when the matter is presented for decision, is far different from the Company's claim that the proceeding was never properly before the Commission for decision—and this by virtue of an agreement made before the Congressional amendments specified readjustment as a function for the commission.

2. The view we have taken of the legal issues makes it unnecessary to consider the contention that the Company's ability to claim "rights" secure against Congressional alteration on August 26, 1935, is undercut by its default at that time under the license then outstanding.[26]

---

24. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *cf.* Intl. Assn. of Machinists v. Natl. Mediation Board [*National Airlines*], 138 U.S.App.D.C. 96, 425 F.2d 527 (Jan. 30, 1970).

25. Company counsel has lodged an exhibit that reveals that the license issued by the Commission to the Portland General Electric Company for a project involving the use of lands of the Warm Springs Indians provided for readjustment of Indian rentals by arbitration, pursuant to the agreement of the parties made in 1955 and amended in 1961. 26 F.P.C. 192. We are not called upon to consider whether this complies with § 10(e). In any event, we are not aware of any instances in which an independent regulatory agency deferred its decision-making to an arbitration proceeding where it was considered as one of the parties to the arbitration.

26. Rocky Mountain Power had failed to complete construction within the 3-year period provided in the 1930 license, even as extended for an additional two years

3. The Company contends that this court cannot have jurisdiction if, as the Secretary contended before the Commission, he has a "veto" power permitting him to withhold approval of either the Board's order or this court's order on review. *See* Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). To avoid dismissal of its petition to review, the Company refers to the veto as a reason for requiring the arbitration remedy. There are difficulties with the company's contention, including the point that it is difficult to square with this court's 1962 exercise of jurisdiction in the Third Unit case (*supra*, note 13).

As the case comes to us it contains the Secretary's acceptance of the Commission's Opinion and Order 529, notwithstanding its rejection of contentions put forward by the Secretary, but without prejudice to the Tribes' continuing to urge their contentions. Before this court the Secretary has disclaimed any right to disapprove the ruling of this court.

In our view this disclaimer is only what the law requires. The Secretary will be bound whether we affirm the Commission's ruling on the merits, or hold in favor of the Company's contention on the merits, in whole or in part.

The Secretary's approval under the 1928 law (*supra*, note 3), like the approval of the Secretary and of the Indian Tribes referred to in § 10(e) of the Act, is manifested initially by the concurrence with the licensee which must exist in order for the application for the original license (either as filed, or as modified to take account of objections found in the original filing) to be approved by the Commission. It is manifested as to readjustment of rentals by the filing with the Commission, or acquiescing in presentation to the Commission, of an application requesting readjustment. The readjustment decision is made by the independent regulatory agency assigned this function by Congress, subject to review by the court of appeals. After approval of the presentation of the application for readjustment the only further recourse of the Secretary or the Tribes is the right of appeal provided by law for the correction of errors made by the commission.[27]

The case will now proceed to the merits. Since a member of the original division, Honorable Warren E. Burger, is

by Amendment 1 in 1932. The Company's motion of February 16, 1935, for an extension from May 1935 to 1938 failed to obtain the approval of the Secretary of Interior, and was denied by the Commission on April 1, 1935. The Commission ordered the matter referred "for appropriate legal action" to the Attorney General who had authority to institute proceedings for revocation of a license. Fifteenth Annual Report of the Federal Power Commission 178–79 (1935). These facts are all set forth in the recitals to Amendment No. 2, issued by the Commission July 17, 1936, after approval by the Secretary and acceptance by the Company.

The record shows that one of the reasons why the Interior Department preferred the Company's proposal over Mr. Wheeler's was the earlier date in which the Company would be able to begin construction and service. Sen.Doc. 37–38.

Amendment 2 reduced the project to two generating units, and provided for a new schedule of payments the Company had worked out in an agreement reached with the Tribes, which had in 1935 been organized as a self-governing tribe under the Indian Reorganization Act of 1934. 48 Stat. 984, 25 U.S.C. §§ 461–479 (1964). Annual rental payable, originally limited by a peak rent of $175,000, was increased to figures exceeding $175,000 for each of thirteen years. Also the Company agreed to give preference to members of the Tribe in hiring of employees for both construction and operation of the power project.

27. It cannot sensibly be contended that the "approval" required under the 1928 law required the Secretary to approve each readjustment of rentals. If that were so, the Secretary could not validly have entered into the arbitration agreement in 1930.

The "approval" of the original license, either under the 1928 law or under the provision to § 10(e), carries with it approval of the procedure for readjustment that has been either prescribed by, or established in accordance with, the Congressional enactment.

no longer a member of this court, his place will be taken by another member of the court selected by lot in accordance with the long-standing procedure prescribed by resolution of the Judicial Council. The case will be reargued on the merits to the division thus constituted.

So ordered.

BAZELON, Chief Judge (concurring):

I admit to substantial doubt whether Congress in 1935 ever considered the precise situation we face today. Likewise, I cannot say that a change in forum might not, in other circumstances, give rise to constitutional problems at least of such magnitude that we would be constrained to interpret ambiguous statutory language so as to avoid the constitutional question. I agree, however, that § 28 of the Act was not intended to preserve the particular forum in which a given dispute is to be adjudicated; and that the 1935 amendment may be applied to the present case without constitutional difficulty. On that basis I join Judge Leventhal's opinion.

TAMM, Circuit Judge, with whom Circuit Judges McGOWAN and MacKINNON join (dissenting):

My views concerning the proper disposition of this case require a more complete statement of the historical background and factual context of this controversy than is contained in the majority opinion.

Prior to 1920, the development of water resources as a potential source of electric power was governed by provisions of the General Dam Acts, 34 Stat. 386 (1906), 36 Stat. 593 (1910). Under these Acts, the right to alter or amend the licenses of power projects was reserved by Congress, and no rights vested in licensees. This policy rendered investments in power projects quite speculative, thereby deterring public investors from providing the capital needed to develop the nation's water power resources. Congress soon became aware of these shortcomings in the existing law and undertook an exploration of alternative solutions to the problem. One of these new proposals was S.1419, which ultimately became the Federal Water Power Act of 1920. In the Senate Report accompanying this bill, the existing statutory scheme was sharply criticized because it provided for the imposition of "conditions upon which the permit may be granted that render the terms of the investment so uncertain and * * * so defeasible that those having capital can not safely and will not make investments under them." S. Rep. No. 179, 65th Cong., 2d Sess. 3 (1917). A proponent of the Federal Water Power Act noted that the new approach taken in the 1920 Act was designed to provide a "method by which the water powers of the country * * * can be developed by public or private agencies under conditions which will give the necessary security to the capital invested and at the same time protect * * * [the] public interest." H.R.Rep. No. 61, 66th Cong., 1st Sess. 5 (1919).

The primary method that Congress chose for safeguarding the security of investments under the Federal Water Power Act was embodied in section 28 of that legislation, which provided:

[T]he right to alter, amend, or repeal this Act is hereby expressly reserved; *but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this Act, or the rights of any licensee thereunder.*

41 Stat. at 1077 (emphasis added). The 1920 Act also contained provisions which stated that licenses could be issued for a term of not more than fifty years, and that "when licenses are issued involving the use of * * * tribal lands * * * within Indian reservations the [Federal Power] commission shall fix a reasonable annual charge for the use thereof, and such charges shall be readjusted at the end of twenty years * * * *in a manner to be described in each license.* * * *" 41 Stat. at

1069. The Commission had occasion to review the effect of these provisions and the Congressional intent underlying them in Annual Charges Prescribed for Licensees Under the Federal Power Act, 31 F.P.C. 1555, 1557–58 (1964):

The legislative history of the Federal Water Power Act reveals several important efforts to include a provision enabling the Commission to adjust annual charges. Initially, Rep. Sherley of Kentucky succeeded in amending H.R. 16053, 63rd Cong., 2d Sess. (1914) to provide:

The Secretary of War may provide as a condition of such approval for the payments to the United States of reasonable annual charges for the benefits that accrue to the grantee * * * and *at the end of twenty years, and every ten years thereafter, the Secretary of War may readjust the annual charges as may then be just and reasonable.* [Citing 51 Cong.Rec. 12,759 (1914); (emphasis added by the Commission).]

When the House was considering H.R. 3184 which, as amended, became the Federal Water Power Act, the Sherley Amendment had its sequel in the unsuccessful Little Amendment. * * *

Representatives Small of North Carolina and McArthur of Oregon opposed the Little Amendment in [the floor] debate on the ground that it would discourage investment in the hydro-electric industry. Representatives Ferris of Oklahoma and Sims of Tennessee argued that since the Commission could provide for adjusting annual charges in the licenses, the Little Amendment was unnecessary. Representative Sims made it abundantly clear that adjustment was not possible without a license provision allowing it:

Mr. Little. *But they have to do it when they issue the license or they forever forfeit any chance to adjust the charges to changing conditions.*

Mr. Sims. They have to put it in the license. [Citing 58 Cong.Rec. 2223 (1919) (emphasis added).]

The Little Amendment was rejected, and H.R. 3184 was passed and sent to the Senate.

The Senate report on the bill proposed an amendment which, while it would have confined the purposes for which annual charges could be fixed, would have permitted their periodic adjustment [by the Commission]. * * * The Senate in approving H.R. 3184 adopted this amendment. The House being in disagreement with the Senate amendments, the bill was referred to conference committee, in which * * * the language as finally enacted in subsection 10(e) was worked out. * * *

The legislative history thus shows that Congress rejected the two proposals which would have expressly authorized the Commission to adjust annual charges, even though both proposals contained a minimum period for successive adjustments.

It would be difficult indeed to imagine a clearer or more specific expression of congressional intent to immunize license provisions, particularly those relating to readjustment, from unilateral governmental action beyond the ambit of the methods and criteria specified in the individual license.

In the same year that the Federal Water Power Act was passed by Congress, the Montana Power Company approached the Government regarding the possibility of obtaining a license to construct and operate a hydroelectric project on the Flathead Reservation. (*See* S.Doc.No. 153, 71st Cong., 2d Sess. 3 (1930).) The lengthy negotiations described in the majority opinion ensued, and the record of these negotiations leaves no question that the problem of finding a workable method to determine a fair rental charge for use of the Flathead site was one of the hardest issues confronting the parties. The Commission, the Army Corps of Engineers, and

the Bureau of Indian Affairs all made various proposals during the period from January 2, 1930 to April 1, 1930; in all, "[f]our months of negotiations were consumed in discussing those various plans * * * and [the parties] were never able to reach an agreement. Several deadlocks actually developed with the breaking off of negotiations." (J.A. 183–184.) Finally, the parties agreed upon a flat rental system because this method assured the Tribes of a stable income throughout the fifty-year term of the license. The rental was set at levels which increased at the end of the second, third, fourth, and fifth years of the project, then increased again at two intervals of five years each, and finally reached the sum of $175,000 per year "[f]or the next five years and/or until readjustment of the annual charges" required by the Federal Water Power Act after twenty years of operation. (J.A. 184–185.)

The readjustment provision ultimately incorporated into Article 30(D) of the license stated that the readjustments in the rental amount mandated by the Federal Water Power Act would be effected "by mutual agreement between the commission and the licensee, with the approval of the Secretary of the Interior. In case the licensee, the commission, and the Secretary of the Interior can not agree upon the readjustment of such charges, it is hereby agreed that the fixing of readjusted charges shall be submitted to arbitration in the manner provided for in the United States arbitra-

tion act. * * *" (J.A. 186.) This provision supplanted an earlier Commission proposal under which readjustment would have been made "upon the facts *as found by the commission* at such times of readjustment." (J.A. 203; emphasis added.)

When the Federal Water Power Act was amended to become part of the Federal Power Act in 1935, section 28 of the former Act, guaranteeing the preservation of rights vested in existing licensees, was carried forward into the new legislation without any change. At the same time, section 10(e) of the 1920 Act, which had provided that readjustments were to be made "in a manner to be described in each license," was amended to state that readjustments of the annual charges were to be made *by the Commission*. The amendatory language on its face is wholly prospective, and, as I read it, reflects no Congressional intent to abridge inconsistent readjustment provisions contained in outstanding licenses.[1] Both the House[2] and the Senate[3] Reports accompanying the amendments describe the changes as "minor" and "clarifying"—language that is surely a classic understatement if it is designed to convey an intent to let the Commission rewrite readjustment provisions in all existing licenses. In fact, I think it is fair to say that the available evidence indicates that Congress did not intend to affect license provisions like the one in question, and that the majority's interpretation of the

---

1. Section 10 of the Act, which is now codified in 16 U.S.C. § 803 (1964), states:
   *All licenses issued under* * * * *this title shall be on the following conditions:*
   * * * * *
   (e) * * * [*W*]*hen licenses are issued* involving * * * tribal lands embraced within Indian reservations the Commission shall * * * fix a reasonable annual charge for the use thereof, and such charges may * * * be readjusted by the Commission * * * upon notice and opportunity for hearing * * * * (Emphasis added.)
   *See also* 16 U.S.C. § 799 (1964):

Licenses under * * * this title shall be issued for a period not exceeding fifty years. Each such license shall be conditioned upon acceptance by the licensee of all of the terms and conditions of this chapter and such further conditions, if any, as the Commission shall prescribe in conformity with this chapter. * * * *

2. H.R.Rep. No. 1318, 74th Cong., 1st Sess. 7, 24 (1935).

3. S.Rep. No. 621, 74th Cong., 1st Sess. 17, 45 (1935).

legislative history rests upon questionable or erroneous inferences.

On its face, section 28 of the 1920 Act is designed to protect *all* rights granted in licenses issued under that legislation, not just those provisions which a court or a different Congress might later deem "important": this section uses careful disjunctive phrasing to provide that subsequent legislative action will not *"affect any license* theretofore issued * * * *or the rights* of any licensee thereunder." The lengthy summary of the legislative history of the 1920 Act quoted above clearly indicates that the Congress which first enacted section 28 would not have believed or intended that the present result could be reached under that legislation. The majority concludes, however—by inferring Congressional intent from evidence that is admittedly equivocal—that Congress apparently meant something quite different by the language of section 28 when it reenacted this provision in 1935: now the Commission would be permitted to readjust all rental amounts even though a different method had been specified in the license.

Even if I could accept the theory that (1) after 1935 section 28 was limited to protecting only those license provisions which the Commission and the courts would deem "substantive" or "important," and (2) rental readjustment provisions in licenses issued under the 1920 Act are not prima facie within this category by virtue of the strong legislative history of the 1920 Act and the congressional silence in 1935, I still would not be able to agree with the majority's analysis of the interests at stake in this case.

The majority asserts that the arbitration clause is "remedial," which renders it procedural and hence defeasible, absent some exceptions which will be discussed below. I believe that this characterization misconceives the function of the arbitration clause in Montana Power's license. Clearly, such an inquiry into the purpose' and functional role of the provision is necessary here; for, as

Judge (later Justice) Cardozo said in Berkovitz v. Arbib & Houlberg, Inc., 230 N.Y. 261, 271, 130 N.E. 288, 290 (1921):

> The word "remedy" itself conceals at times an ambiguity, since changes of the form are often closely bound up with changes of the substance. * * * The problem does not permit us to ignore gradations of importance and other differences of degree. In the end, it is in considerations of good sense and justice that the solution must be found.

*See also* Guaranty Trust Co. v. York, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945): "Neither 'substance' nor 'procedure' represents the same invariants. Each implies different variables depending upon the particular problem for which it is used."

At the outset, it is clear from the *Erie* doctrine cases and the majority opinion that even where arbitration is clearly being used as a remedial device—most familiarly, in resolving disputes over the construction or performance of contracts by recourse to an impartial third party —it "substantially affects the cause of action" and "may make a radical difference in ultimate result." Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 198, 203, 76 S.Ct. 273, 100 L.Ed. 199 (1956); *see also* Byrd v. Blue Ridge Rural Elec. Cooperative, Inc., 356 U.S. 525, 539, 78 S.Ct. 893, 2 L.Ed.2d 953 (1959). Thus, even under the majority's analysis, it is clear that the company may well be forced to pay substantially greater rentals for thirty years out of the fifty-year term of the license than it would be if the arbitration clause were given effect. This fact, standing alone, should make us extremely wary of the Commission's facile attempts to dismiss the clause as merely "procedural."

However, I think it is perfectly clear that the arbitration clause in Montana Power's license is different in fact and function from the majority's characterization of it. Unlike the typical arbitration clause that is used to resolve contract disputes, this provision is *not* trig-

gered by one party's claim of breach; rather, it is used as a method of defining a key term in the license at a specified future time, as mandated by the Federal Water Power Act of 1920. The Supreme Court has observed the validity of a similar distinction, while not making it determinative, in cases involving alleged impairments of the obligations of contracts:

> The provisions [of the contract] dealing with forfeiture, which is one of the State's *remedies in case of breach,* and reinstatement, which is the purchaser's *remedy to cure his breach, both operate* on the rights of a party *after breach and thus concern the enforcement of the contract. In this sense they are remedial* and the statute of repose challenged here is an alteration of remedy rather than obligation.

City of El Paso v. Simmons, 379 U.S. 497, 506 n. 9, 85 S.Ct. 577, 582, 13 L. Ed.2d 446 (1965) (emphasis added). As a term-fixing mechanism, the arbitration provision was not intended to be used only for extraordinary contingencies such as a claim of breach, but rather was designed to be employed during the normal course of performance in the not-unlikely event that the parties were unable to agree upon an adjusted rental amount. One need look no further than the hornbooks to be reminded that this is a familiar practice in contract law:

> In the process of negotiating an agreement, a term that is most frequently left indefinite and to be settled by future agreement, or by some other specified method, is the price in money. \* \* \* If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract.
>
> \*     \*     \*     \*     \*     \*
>
> It is sufficient if the agreement provides that the price shall be the amount that arbitrators or that X, a specific third person, shall fix as a fair price.

1 Corbin on Contracts 423–425, 435–436 (1963). Additionally, the inquiry which would be made pursuant to Montana Power's arbitration clause is significantly different from having an arbitrator determine how a disputed contract term should be interpreted or what damages should be assessed for breach. In the latter situation, there is typically a relatively narrow question, and a relatively large body of principle to guide the decision. Here, although the majority leaves intact the license provision stating that readjusted rentals are to be based upon "the commercial value of the tribal lands involved, for the most profitable purpose for which suitable," it is clear that valuation problems for hydroelectric projects of this kind are extremely vague and complex and that the foregoing standard offers little help in resolving them. This is amply demonstrated by the nature and volume of the arguments which the parties have addressed to the merits of the Commission's rental readjustment, and, unfortunately, I suspect that it will also be reflected in any opinion rendered by the division of this court which is assigned to pass upon the merits. Because of this lack of readily ascertainable standards guiding the inquiry, the qualities and characteristics of the tribunal making the decision become *pro tanto* more important to the parties; and in this regard it must be remembered that the Commission was a party to the original agreement, albeit in somewhat different form.

Therefore, I believe that it is clear on the face of the license and the legislative history that the arbitration clause is "important" enough, even under a narrow reading of section 28, to survive the 1935 amendments; and I think that this conclusion is supported, rather than controverted, by the record of license negotiations. Before examining this question in detail, however, I think it should be emphasized that the preliminary negotiations provide a much less reliable

indicator of the substantive importance of a license provision than an appraisal of the provision's functional role in the license. Experience teaches that parties frequently agree upon some of the most important terms of contracts without a lot of bickering or negotiation; and fairness dictates that Montana Power should not be penalized for agreeing too readily to the proffer of arbitration as a term-fixing mechanism. Moreover, it should be remembered that the published records of the license negotiations are not by any means verbatim transcripts; rather, they are summaries prepared for the use of the Government in its capacity as potential negotiator of similar licenses in the future. Thus, relying upon these records is a rather speculative enterprise, particularly when making the kind of implication from silence that the majority is asserting on this point. However, to the extent that the history of negotiations may be useful to elucidate the present inquiry, I think it points as strongly to the conclusion that the arbitration clause was considered substantively important and indefeasible.

As the majority points out, the parties to this license, particularly the Government, approached the task of negotiation and drafting with acute awareness that their acts would have great precedential significance; the Scattergood Report states that "it would seem unusually appropriate that special care be taken to develop the factors for regulation under the Federal water power act * * * and for the preparation of a model lease." (J.A. 137.) This care by the parties extended to the task of making sure that the precise instances and scope of future governmental regulation would be specified in the license, in accord with the usages of the 1920 Act. This was done with many sections of the license, both in the negotiations (*see* S. Doc. No. 153, 71st Cong., 2d Sess. 7–9 (1930)) and in the license itself (*see* J. A. 237–258); yet, provision for possible government regulation is notably absent from the readjustment section contained

in the license. Moreover, as noted above, the arbitration clause was allowed to become part of Montana Power's license only after the company had rejected the government's proposal to have rentals readjusted "upon the facts as found by the commission." (J.A. 203.) Finally, when the license was renegotiated shortly after the passage of the 1935 amendments, the parties themselves provided a practical construction of the license which showed that they believed the arbitration clause to be important enough to remain fully effective. During these renegotiations, the Tribes and the Commission were in a very advantageous bargaining position—and Montana Power was in a very poor one—by virtue of the company's default on its construction obligations; however, the parties included language in the amended license which reflects their belief that the arbitration clause remained in full effect. In the Schedule of Annual Charges contained in Amendment No. 2, the parties stipulated that the rental for the year 1954 would be $205,000, and that "[t]hereafter, *until adjustment of the annual charges payable hereunder shall have been effected pursuant to the provisions of paragraph (D) of this Article 30* [the arbitration clause]," the annual rental amount would be $175,000. (J.A. 271; emphasis added.)

Against this background, I find the majority's analysis of the negotiations extremely artificial. The majority concedes—as it must—that there was initially a period of hard bargaining over the price term of the lease. When arbitration entered the picture, however, these negotiations apparently underwent some strange variety of legal mitosis: suddenly, the first twenty-year period of the price term's effectiveness became "bargained for," while the remaining thirty years of the price term became, not "bargained for" but rather an "open-end agreement" or an "on-going agreement"—phrases which apparently have no legal significance, and scant relationship to what I perceive as the thrust of the negotiations. Suffice it to

say that, in contrast to the relatively simple and expeditious processes of arbitration, this readjustment proceeding certainly has proved to be "open-ended"; there is not even an end to litigation in sight. Other problems remain in the majority opinion, but none seems substantial enough to warrant extending these already lengthy opinions any further, or delaying their issuance any longer. I would require that this controversy be submitted to arbitration forthwith.

MacKINNON, Circuit Judge, with whom Circuit Judge McGOWAN joins (dissenting):

I concur in Judge Tamm's dissenting opinion. The majority opinion relies upon the fact that the 1920 statute, which provided that the readjustment in the annual charge was to be made

"(e) * * * by the Commission * * * *in a manner to be described in each license.* * * *"* (emphasis added) (41 Stat. 1069)

was amended in 1935 to state:

"(e) * * * by the Commission * * * subject to the approval of the Indian tribe * * * *upon notice and opportunity for hearing.*" (Emphasis added) (49 Stat. 843)

From this it concludes that the 1935 amendment operated retroactively to amend the terms and provisions of the license issued to petitioner in 1930 so as to change the manner of readjusting the annual charges that is specifically de-

scribed in petitioner's license, *i. e.,* in the last analysis, arbitration.

In reaching such conclusion the majority opinion overlooks the opening sentence of section 10 which is introductory to subsection (e) and the other subsections thereof. It provides:

Sec. 10. All licenses issued under this part shall be on the following conditions: etc. (49 Stat. 842).

The intent of Congress in this clause is clearly to prescribe the conditions upon which licenses "shall be" issued, not to amend licenses already issued. If Congress had intended to amend existing licenses they would have said "heretofore or hereafter issued." It is also important to note that the prefatory clause of section 10 was part of the original 1920 Act and so the congressional intent manifest therein was for a completely prospective application. The re-enactment of the same language would not change the original intent. And when this introductory clause of section 10 is read in conjunction with section 28 which provides that " * * * no alteration, amendment * * * shall *affect* any license theretofore issued under the provisions of this act, or the rights of licensees thereunder" (emphasis added) (41 Stat. 1077; 49 Stat. 847), it seems abundantly clear that Congress in the 1935 amendment only intended to affect licenses issued thereafter. This interpretation is buttressed by the well-established rule that a retrospective application of legislation is not to be implied.[1]

---

1. "[A] retrospective operation will not be given to a statute which interferes with antecedent rights, or by which human action is regulated, unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'" Union P. R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913).

"In the absence of a clearly expressed legislative intent to the contrary, the court will presume that the law-making power is acting for the future, and does not intend to impair obligations incurred or rights relied upon in the past conduct of men when other legislation was in

force." Cameron v. United States, 231 U.S. 710, 720, 34 S.Ct. 244, 247, 58 L.Ed. 448 (1914).

"Where it is claimed that law is to have a retrospective operation, such must be clearly the intention, evidenced in the law and its purposes, or the court will presume that the lawmaking power is acting for the future only and not for the past; that it is enacting a rule of conduct which shall control the future rights and dealings of men, rather than review and affix new obligations to that which has been done in the past." White v. United States, 191 U.S. 545, 552, 24 S.Ct. 171, 172, 48 L.Ed. 295 (1903).

If there were any doubt about such interpretation it is put at rest by noting that the 1935 amendment providing for notice and opportunity for hearing is not by its terms inconsistent with readjusting the annual charges here involved in the manner prescribed in petitioner's license and doing so upon notice and hearing. It is not necessary to strike down a material provision of petitioner's license in order to give prospective effect to the 1935 Act since it only adds a requirement for notice and hearing. Thus the terms of petitioner's license and a prospective operation of the 1935 amendment can both be applied. Statutes are not to be applied retrospectively unless such legislative purpose is clearly expressed.[2] There is no support in the legislation for the suggestion that the quoted provisions of the 1935 Act were intended to affect existing licenses or to be given a retrospective operation. Such evidence of legislative intention as does appear in section 28 is expressly to the contrary.

2. Hassett v. Welch, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938) ; Miller v. United States, 294 U.S. 435, 439, 55 S.Ct. 440, 79 L.Ed. 977 (1935) ; Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930).