**ASAHI CHEMICAL INDUSTRY COMPANY, LTD., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**American Yarn Spinners Association, Party-in-Interest.**

**Court No. 81-7-00922.**

United States Court of International Trade.

Sept. 14, 1982.

Barnes, Richardson & Colburn, New York City (Edwin F. Rains, James S. O'Kelly and Sandra Liss, New York City, of counsel), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., (David M. Cohen, Director, Commercial Litigation Branch, New York City, Velta A. Melnbrencis, New York City, on the brief), for defendant.

Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D.C. (Joseph H. Price and Simeon M. Kriesberg, Washington, D.C., on the brief), for party-in-interest and American Yarn Spinners Ass'n.

MALETZ, Judge.

This action involves the construction of section 751(a) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1675(a) (Supp. IV 1980). Section 751(a) provides, among other things, for periodic review by the Department of Commerce of antidumping duty orders at least once every 12 months. Plaintiff Asahi Chemical Industry Company, Ltd. (Asahi) contests a final determination by the International Trade Administration of the Department of Commerce (ITA) under this section. The ITA found that a dumping margin of 29.05 percent existed as to Asahi for the review period and, accordingly, ordered that cash deposits of estimated antidumping duties be imposed on future shipments of Asahi's merchandise to the United States. The ITA reached this determination notwithstanding that no Asahi merchandise entered the United States during the review period.

Asahi has moved and defendant United States (the Government) and Party-in-In-

terest American Yarn Spinners Association (AYSA) have cross-moved for judgment on the administrative record, pursuant to rule 56.1 of the rules of this court. For the reasons stated, Asahi's motion is denied, and the Government's and AYSA's cross-motions are granted.

*Facts*

The material facts are not in dispute. After an investigation of spun acrylic yarn from Japan in 1979, the Department of the Treasury found less than fair value (LTFV) margins ranging from 6.13 to 58.21 percent on sales of the merchandise from Asahi. Margins were found on 100 percent of the Asahi sales examined; the weighted average margin was 29.05 percent. 44 Fed.Reg. 61,492, 61,493 (1979). The International Trade Commission determined that such unfairly priced yarn from Japan was causing injury to the domestic industry. 45 Fed. Reg. 19,682 (1980). Accordingly, the Department of Commerce, to which the responsibilities previously held by the Treasury Department had been transferred, ordered the imposition of antidumping duties on Asahi's shipments of spun acrylic yarn to the United States. 45 Fed.Reg. 24,127 (1980).

Pursuant to its statutory responsibility under section 751(a) of the Tariff Act of 1930, as amended, the ITA initiated an administrative review of the outstanding antidumping duty order, which review covered sales during the 8½ month period from July 13, 1979 to March 31, 1980. The ITA found that Asahi had not shipped spun acrylic yarn to the United States during this period, but nevertheless required a deposit of estimated antidumping duties equal to the LTFV margin on the most recent Asahi sales to the United States, i.e., 29.05 percent. 46 Fed.Reg. 32,928, 40,912 (1981).

*The Parties' Constructions of
Section 751(a)*

Section 751(a) provides in part as follows:
SEC. 751. ADMINISTRATIVE REVIEW OF DETERMINATIONS.

(a) Periodic Review of Amount of Duty.—

(1) In general.—At least once during each 12-month period beginning on the anniversary of the date of publication of . . . an antidumping duty order under this title . . . the administering authority, after publication of notice of such review in the Federal Register, shall—

\* \* \* \* \* \*

(B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty . . .

\* \* \* \* \* \*

and shall publish the results of such review, together with notice of any . . . estimated duty to be deposited, . . . in the Federal Register.

(2) Determination of antidumping duties.—For the purpose of paragraph (1)(B), the administering authority shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

The administering authority, without revealing confidential information, shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

Asahi contends that section 751(a) is clear and unambiguous. Read literally, Asahi argues that that section provides that periodic review determinations are to be based exclusively on facts and circumstances as they exist during the review period. It insists that information falling outside of the review period is not to be considered by the ITA. According to Asahi, the ITA is thus

restricted to the review period for the purpose of data gathering. Therefore, Asahi concludes, if no shipments of merchandise to the United States have been made during the review period, then no LTFV margin exists and no deposit of estimated duties on the next entry of Asahi's merchandise into the United States may be required.

The party-in-interest, AYSA, also employs a literal interpretative approach but reaches an opposite conclusion, namely that section 751(a) requires the deposit of estimated duties even though there have been no entries of merchandise during the review period. Read literally, AYSA continues, section 751(a)(2) contemplates that where no entries of merchandise have occurred during that period, an LTFV margin must nevertheless be calculated. In such a situation, AYSA concludes, the ITA must determine the LTFV margin based on the most recent information available to it.

Unlike Asahi and AYSA, the Government maintains that section 751(a) is silent on this question. However, the Government argues, in light of the Trade Agreements Act of 1979 as a whole and its legislative history, Congress intended that under section 751(a) all entries of merchandise under an antidumping duty order—with specific exceptions not applicable here—be subject to estimated duties during the pendency of that order. Thus, according to the Government, Congress did not intend to excuse the deposit of estimated duties on future entries when no shipments have entered the

United States during a particular review period.

## Opinion

■ At the outset, I think it clear—contrary to the positions of plaintiff and AYSA—that section 751(a) does not address the question of how LTFV margins are to be determined when no shipments have been made during a review period. At the same time, faced with this situation, the ITA—the agency charged with administering periodic reviews under section 751(a)—has consistently interpreted the section as requiring resort to the most recent price and value information available to it to determine LTFV margins.[1]

It is of course basic that in order to sustain an agency's interpretation, a court need not find its interpretation to be the only reasonable one or even that it is the result which the court itself would have reached had the question arisen in the first instance in judicial proceedings. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). For the reasons that follow, the ITA interpretation is "sufficiently reasonable" to be accepted by the court. *Id.* at 450, 98 S.Ct. at 2445; *Train v. Colorado Pub. Interest Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976).[2]

■ While it is true that "[t]he starting point in every case involving construction of a statute is the language itself," *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723,

---

1. The Government has cited over 40 administrative cases where the ITA has employed this interpretation. See, e.g., Clear Sheet Glass from Taiwan, 46 Fed.Reg. 23,278 (1981); Pig Iron from Finland, 47 Fed.Reg. 5,279 (1982); and Polychlorophrene Rubber from Japan, 47 Fed.Reg. 2,389 (1982). Asahi has not cited any agency interpretation of section 751(a) at variance with these cases.

2. The Government and AYSA urge the court to defer to ITA's interpretation of section 751(a), inasmuch as ITA is the agency charged with the responsibility of administering periodic reviews under section 751(a). Of course, the administrative interpretation of a statute by the agency charged with its administration is entitled to deference. *Zenith Radio Corp. v. United*

*States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Nevertheless, a contemporaneous agency interpretation of a statute is merely an aid to statutory construction; it is not a substitute for independent judicial inquiry, nor is it conclusive on a court. It is the courts which have the final word on matters of statutory interpretation. *Ithaca College v. NLRB,* 623 F.2d 224, 228 (2d Cir.), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980). See *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is").

756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975), nevertheless, as noted by the Supreme Court in *Lynch v. Overholser,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962):

> The decisions of this Court have repeatedly warned against the dangers of an approach to statutory construction which confines itself to the bare words of a statute, *e.g., Church of the Holy Trinity v. United States,* 143 U.S. 457, 459–462 [12 S.Ct. 511, 512–13, 36 L.Ed. 226]; *Markham v. Cabell,* 326 U.S. 404, 409 [66 S.Ct. 193, 195, 90 L.Ed. 165]. . . .

*Id.* at 710, 82 S.Ct. at 1067. See also *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). Learned Hand observed in this same connection that:

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

What seems evident from a careful examination of the legislative history of the Trade Agreements Act of 1979 is that Congress did not expressly address itself to the issue of how dumping margins are to be determined when no shipments of merchandise have been made during a review period.[3] Confronted with that problem and faced with an identical issue of statutory construction, Judge Leventhal, speaking for the District of Columbia Circuit Court of Appeals in *District of Columbia v. Orleans,* 406 F.2d 957 (D.C.Cir.1968), wrote that:

> The court's effort must be to discern dispositive legislative intent by "projecting as well as it could how the legislature would have dealt with the concrete situation if it had but spoken."

*Id.* at 958 (quoting *City of Chicago v. FPC,* 385 F.2d 629, 635 (D.C.Cir.1967) (footnote omitted)). In this same connection, Judge Leventhal further observed in *Montana Power Co. v. FPC,* 445 F.2d 739 (D.C.Cir. 1970) *(en banc), cert. denied,* 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971):

> [T]he court must discern the applicable legislative intent by what is necessarily an act of projection—starting from the areas where the legislative intent is readily discernible, and projecting to fair and reasonable corollaries of that intent for the specific issue before us.

*Id.* at 746 (footnote omitted).

Most recently, in *National Wildlife Federation v. Gorsuch,* 530 F.Supp. 1291 (D.D.C. 1982), the court noted that:

> When a particular problem has not been addressed by Congress, the court must extrapolate congressional intent from areas where the expression of intent is clear, applying the more generally expressed intent to the specific issue before it.

*Id.* at 1304.

 Turning then to the legislative history of the Trade Agreements Act of 1979, two points are readily discernible. First, Congress was primarily concerned with the collection of antidumping duties once an antidumping duty order had issued, not with providing exceptions to or avoidance of such collection. Second, Congress intended that in the ascertainment of LTFV margins, actual entries, sales and purchases of merchandise be utilized, not their absence.

Considering the first point, Congress evidenced its intent to make cash deposits of estimated duties on merchandise subject to an antidumping duty order the general rule, subject to two express exceptions. The first exception provides for a waiver of cash deposits for those importers who have taken

---

**3.** The legislative history of section 751(a) is particularly uninstructive, tracking nearly verbatim the language of section 751(a) as enacted. See S.Rep.No. 249, 96th Cong., 1st Sess. 80 (1979); H.R.Rep.No. 317, 96th Cong., 1st Sess. 71–72 (1979), U.S. Code Cong. & Admin. News, p. 381.

steps to revise their prices so as to significantly lower the LTFV margin. See section 736(c), 19 U.S.C. § 1673e(c). Thus the report of the House Committee on Ways and Means on that section states that:

> [M]erchandise subject to an antidumping duty order may be entered only upon the deposit of estimated antidumping duties. . . .
>
> \* \* \* \* \* \*
>
> [T]he bill provides a limited exception [i.e., section 736] to the requirement of a deposit of estimated duties for importers who have taken steps to eliminate or substantially reduce dumping margins between the date of an affirmative preliminary determination by the Authority [the ITA] and the final affirmative determination by the ITC [International Trade Commission].

H.R.Rep.No. 317, 96th Cong., 1st Sess. 69–70 (1979).

In addition, the Senate Finance Committee report on section 736(c) states that:

> Generally, estimated duty deposits equal to the amount of the estimated antidumping duty would be required to be deposited at the same time as estimated normal customs duty deposits must be made with respect to the merchandise under section 505(a) of the Tariff Act of 1930 (19 U.S.C. 1505). However, the administering authority could permit the importer to post a bond or other security in lieu of estimated antidumping duty deposits for not more than 90 calendar days after the date on which the antidumping duty order is published under certain conditions. . . .
>
> \* \* \* \* \* \*
>
> *Reason for the provision.*—Section 736 would establish time limits on the assessment of antidumping duties, require cash deposits of estimated duties upon entry, and prescribe the entries to which antidumping duties may be applied. . . . [T]he committee intends that antidumping duties be collected expeditiously.

S.Rep.No. 249, 96th Cong., 1st Sess. 76 (1979), U.S. Code Cong. & Admin. News at p. 462.

The second express exception to the general rule that estimated duties are to be deposited on entries of merchandise subject to an antidumping duty order is the changed circumstances provision of section 751(b), 19 U.S.C. § 1675(b). Under that section an antidumping duty order may be modified or revoked upon a showing by the importer of changed circumstances sufficient to warrant a review.

Neither the section 736(c) nor section 751(b) exception is applicable here.

Finally, the Senate Finance Committee commented on the "dismal performance of the Department of the Treasury in assessing special dumping duties." S.Rep.No. 249 at 76–7, U.S. Code Cong. & Admin. News at pp. 462–463. Likewise, the House Ways and Means Committee expressed its dissatisfaction "with the past record of the Secretaries of the Treasury in assessing duties on entries subject to a dumping finding." H.R.Rep.No. 317 at 69.

In short, the discernible legislative intent is that Congress was primarily concerned with the expeditious collection of antidumping duties once an antidumping duty order is in effect, not with exceptions thereto or avoidance thereof. Indeed, when Congress wanted an exception it expressly so provided.

What is more, the consistent congressional focus in the Trade Agreements Act and its legislative history is on actual shipments, sales and purchases of merchandise, not on the absence of such shipments, sales or purchases, when ascertaining LTFV margins. In addition to the foregoing legislative history which refers only to actual entries of merchandise, the statutory definitions of "United States price" and "foreign market value" both contemplate price and value calculations based on actual purchases and sales of merchandise. Thus, section 772, 19 U.S.C. § 1677a, provides in part as follows:

> SEC. 772. UNITED STATES PRICE.
>
> (a) UNITED STATES PRICE.—For purposes of this title, the term "United States price" means the purchase price, or

the exporter's sales price of the merchandise, whichever is appropriate.

(b) PURCHASE PRICE.—For purposes of this section, the term "purchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from the manufacturer or producer or the merchandise for exportation to the United States....

(c) EXPORTER'S SALES PRICE.— For purposes of this section, the term "exporter's sales price" means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, as adjusted under subsections (d) and (e).

Further, section 773, 19 U.S.C. § 1677b, provides in part as follows:

SEC. 773. FOREIGN MARKET VALUE.

(a) DETERMINATION; FICTITIOUS MARKET; SALES AGENCIES.—For purposes of this title—

(1) IN GENERAL.—The foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States—

(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption, or

(B) if not so sold or offered for sale for home consumption, or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States, ...

Additionally, section 773(a)(1), 19 U.S.C. § 1677b(a)(1), prohibits the use of fictitious or pretended sales or markets in the ascertainment of foreign market value:

In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

These statutory provisions and the legislative history set out above thus evidence Congress' intent that the ITA is to consider only the actual entry, sale and purchase of merchandise when calculating antidumping duty assessments and estimates under section 751(a). Projecting how Congress would have dealt with the concrete situation of determining LTFV margins when no shipments occur during a review period, it is reasonable to conclude that Congress would have directed the ITA to use the most recent price and value information available based on actual entries, sales and purchases of merchandise—as the ITA has consistently done. The court, therefore, concludes that the ITA interpretation of section 751(a) has a reasonable basis in law.

■ Asahi's interpretation, on the other hand, taken to its logical extreme, would lead to an absurd conclusion. For its position is that the absence of shipments during a review period means that there is no LTFV margin. This is tantamount to concluding that the foreign market value of Asahi's merchandise is less than or equal to the United States price, or, conversely, that the United States price of its merchandise is greater than or equal to the foreign market value of that merchandise. Not only is such a conclusion patently illogical, it is a fiction which runs contrary to the spirit and intent of the Trade Agreements Act. If a reading of a statute leads to a result which is "contrary to the congressional intent and leads to absurd conclusions," it is to be rejected. *United States v. Bryan,* 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950). "No rule of construction necessitates ... acceptance of an interpretation resulting in patently absurd consequences." *United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948).

*Conclusion*

For the foregoing reasons, defendant's cross-motion for judgment on the administrative record is granted; party-in-interest's cross-motion for judgment on the administrative record is granted; and plaintiff's motion for judgment on the administrative record is denied.