PQ CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant,

and

Rhone Poulenc, Inc.,

and

Rhone Poulenc, S.A., Defendants-Intervenors.

Court No. 84–12–01709.

United States Court of International Trade.

Jan. 27, 1987.

Mandel, Grunfeld & Sosnov (Bruce Mitchell and Steven R. Sosnov), New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (Sheila N. Ziff), Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Donohue and Donohue (John M. Peterson and James A. Geraghty), New York City, for defendants-intervenors.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiff, a U.S. producer of anhydrous sodium metasilicate (ASM), challenges the final results of the third administrative review, made pursuant to 19 U.S.C. § 1675 (1982), by the United States Department of Commerce, International Trade Administration (ITA), of an antidumping order on ASM imported from France. In its review the ITA determined that dumping margins no longer exist for ASM, that no antidumping duty would be assessed, and that 60 percent cash deposits of estimated antidumping duties were no longer required. This matter is before the court pursuant to plaintiff's motion for judgment upon an agency record under Rule 56.1.

The question presented is whether ITA's determinations are supported by substantial evidence in the record and are otherwise in accordance with law, 19 U.S.C. § 1516a(b)(1)(B) (1982). Specifically:

(1) Whether ITA erred in considering the only importation of ASM from France during the review period, where the importation was admittedly made for the purpose of adjusting antidumping cash deposit rates;

(2) Whether ITA erred in determining United States price by applying purchase price to a transaction between a foreign manufacturer's U.S. subsidiary and an unrelated U.S. buyer, which occurred prior to importation;

(3) Whether ITA erred in not deducting the deposit of estimated antidumping duties from United States price, where the deposit was paid by the exporter's subsidiary without being passed onto the U.S. buyer, and where, as to the relevant merchandise, no antidumping duty was ever actually assessed;

(4) Whether ITA erred in basing its weighted average foreign market value upon home market sales of identical merchandise made during a 30 day period extending past the exportation or sales date.

## BACKGROUND

On January 7, 1981, ITA published an antidumping order which, in pertinent part, directed Customs to require cash deposits of estimated antidumping duties in the amount of 60 percent *ad valorem* on ASM imported from France. 46 Fed.Reg. 1667 (1981). This 60 percent deposit rate re-

mained in effect during the first and second administrative reviews of the antidumping order, during which time there had been no shipments of ASM. 47 Fed. Reg. 15620 (1982); 47 Fed.Reg. 44594 (1982).

Although defendant-intervenors claimed that the conditions which gave rise to the initial dumping had changed,[1] ITA's position was that it was without power to adjust cash deposit rates without an actual importation made during the period of review. In meetings with defendant-intervenors, ITA officials suggested that making an actual importation was the proper way to establish that conditions had changed. As a result, a "decision was made to make one sale in a commercial quantity to provide a predicate for the deposit adjustment." Intervenors' Brief at 5–6.

A single shipment of ASM was imported from France in 1982 pursuant to a back-to-back sale and resale involving Rhone Poulenc, S.A. (Rhone France), its U.S. subsidiary, Rhone Poulenc, Inc. (Rhone U.S.), and an unrelated U.S. buyer.[2] The transactions occurred as follows: July 7, 1982, Rhone U.S. placed an order with Rhone France;[3] July 9, Rhone France confirmed Rhone U.S.'s order, Rhone U.S. recorded an order for an unrelated U.S. buyer, and the buyer confirmed its order; July 19, the merchandise was exported from France; and July 27, the merchandise was imported into the United States in the name of Rhone U.S.

and sent directly from the port of entry to the U.S. buyer.

The 60 percent deposit of estimated antidumping duties was paid by Rhone U.S., through its broker and apparently was never included in the price paid by the U.S. buyer.

In the third administrative review, which covered the July 1982 sale of ASM, ITA determined that no dumping margins existed for 1982, that antidumping duties should not be assessed upon the 1982 entry, and that no cash deposits of estimated antidumping duties shall be required until publication of the final results of the next administrative review. 49 Fed.Reg. 43733 (1984). It is this third review which is at issue.

## I. ANNUAL REVIEW BASED UPON A SINGLE ENTRY

Section 751 of the Tariff Act of 1930 provides for administrative review of antidumping duty orders. At the time of the third review, section 751(a) required, in pertinent part, that ITA review its antidumping duty orders at least once a year,[4] and that it:

shall determine—

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry

---

1. Defendant-intervenors state that the principal change has been that of exchange rates, which went from slightly over 4 francs to the dollar, during the initial importation, to nearly 7 francs to the dollar, during the July 1982 importation. They note that this devaluation of approximately 40 percent largely closed the 60 percent dumping margin.

2. Additional background information regarding the parties and merchandise at issue may be found in this court's prior opinion. *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 592 F.Supp. 1318 (1984).

3. The record indicates that "[r]egarding the single sale of ASM in the United States during the period of review, the first contact between

[Rhone U.S.] and [the unrelated U.S. buyer] was on July 7, 1982." [C.R. 9 at 2]. [References to the confidential record will be designated "C.R. ——" and references to the public record will be designated "P.R. ——." References to specific page numbers or sections will be indicated where appropriate.]. There is nothing in the record to establish the exact nature of this contact, however, and it was not until July 9, 1982, that the unrelated U.S. buyer actually placed its order with Rhone U.S. [C.R. 9, Exhibit 2–D; C.R. 3].

4. One of the changes made to 19 U.S.C. § 1675 in 1984 was to provide for such annual reviews "if a request for such review has been received." The 1984 amendments, however, do not apply to the third administrative review at issue.

exceeds the United States price of the entry.

19 U.S.C. § 1675(a)(2) (1982). The statutory definition of foreign market value provides that "[i]n the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account." 19 U.S.C. § 1677b(a)(1) (1982). There is no comparable provision in the statute's definition of United States price. *See* 19 U.S.C. § 1677a (1982).

## A. "EACH" ENTRY

Plaintiff argues that, in conducting its third administrative review, pursuant to section 751(a), ITA should not have determined the foreign market value and United States price of the July 1982 entry. Specifically, plaintiff states that "[o]ne entry alone in a given year does not fit into the statutory mold" and, relying upon a dictionary definition of the word "each" as it is used in § 751(a), asserts that "[t]here must be more than one entry to use correctly the word 'each.'" In addition, plaintiff contends that *"an 'actual sale' for the purpose of creating a fictitious market is no sale at all,"* Plaintiff's Brief at 12, and urges that "to affirm the Congressional intent, common sense, and reality, section 773(a)(1), 19 U.S.C. § 1677b(a)(1) [the definition of foreign market value] should be read *in pari materia* with the provisions relating to United States price, section 772, 19 U.S.C. § 1677a." *Id.* at 13–14.

Plaintiff's reliance upon the dictionary definition of the word "each"[5] if allowed to govern interpretation of section 751(a), would lead to absurd results that are contrary to Congressional policy. As the court has noted in an earlier interpretation of section 751(a):

[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Asahi Chemical Industry Co., Ltd. v. United States,* 4 CIT 120, 124, 548 F.Supp. 1261, 1265 (1982) (citing Learned Hand in *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)).

In *Asahi* the court rejected the literal interpretive approach of the plaintiff and party-in-interest and, after examining related statutory provisions and their legislative history, concluded that:

These statutory provisions and the legislative history set out above thus evidence Congress' intent that the ITA is to consider only the actual entry, sale and purchase of merchandise when calculating antidumping duty assessments and estimates under section 751(a). Projecting how Congress would have dealt with the concrete situation of determining LTFV margins when no shipments occur during a review period, it is reasonable to conclude that Congress would have directed the ITA to use the most recent price and value information available based on actual entries, sales, and purchases of merchandise—as the ITA has consistently done.

4 CIT at 127, 548 F.Supp. at 1267. The court rejected Asahi's interpretation that ITA must limit its review exclusively to facts and circumstances as they exist during the review period, even when there has not been a single entry during the period. *Id.* The court noted that Asahi's interpretation, taken to its logical extreme would lead to the absurd conclusion that in the absence of entries during a review period, U.S. price is no longer less than foreign market value, and thus there can be no

---

**5.** Plaintiff cites the following definition for the word "each" Syn. 1. EACH, EVERY are alike in having a distributive meaning. Of two or more members composing a (usually) definite aggregate, EACH directs attention to the separate members in turn: *Each child* (of those considered and enumerated) *received a large apple . . . . The Random House Dictionary of the English Language,* Unabridged 447 (1966).

antidumping margin. 4 CIT at 127–28, 548 F.Supp. at 1267.

Plaintiff cites *Asahi* in arguing that "[f]or much the same reason that the court did not permit the absence of a shipment to erase the estimated deposit requirement, it should not permit the presence of *this one* sale to do the same: viz. such would be contrary to the intent of Congress." Plaintiff's Brief at 9. As the court made clear in *Asahi*, Congress' intent was that "ITA is to consider only the actual entry, sale and purchase of merchandise when calculating antidumping duty assessments and estimates under section 751(a)." 4 CIT 127, 548 F.Supp. at 1267. ITA has not based its determination upon the absence of data, but rather it used the most recent price and value information available based upon an actual entry and sale of merchandise to calculate United States price, and actual foreign sales to calculate foreign market value.

■ The court finds no expression of Congressional intent to require ITA to disregard an actual entry, where that entry is made during a period that includes no other entries. Congress' reference to "each entry" was most likely merely an expression of its intention that antidumping duties determined pursuant to administrative reviews should be based on an entry-by-entry basis. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 71 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 79 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 465. Where there is only one entry made during a review period, ITA's determination will clearly be made on an entry-by-entry basis, and there is no reason to interpret the reference to "each entry" as requiring anything more.

### B. FICTITIOUS SALE

Defendant-intervenors readily concede that the July 1982 sale was intended to "provide a predicate for the deposit adjustment"; however, they assert, along with the defendant, that the sale was *bona fide* in every respect, and that in any event, Congress would never have intended the fictitious market analysis to be applied in the definition of United States price.

The fictitious market analysis prevents parties from manipulating dumping margins by either setting up pretended sales, or offering merchandise at a price that does not reflect its actual market price. In the context of determining United States price, pretended sales between related or interested parties could thwart Congressional intent. There is no indication of any such sales in this case. In its investigation, ITA found no evidence of any relationship or dealings between the U.S. buyer and defendant-intervenors that might indicate that the sale was other than a *bona fide* arm's length transaction. Furthermore, since the price which the U.S. buyer paid to Rhone U.S. was lower than the price charged by its United States supplier, the U.S. buyer's actions were consistent with good business practices of purchasing acceptable material at considerable savings.

■ In the absence of any evidence that the 1982 sale was anything less than a *bona fide* arm's length transaction, there is no need to read the fictitious market analysis into the determination of United States price. As a practical matter, there is no danger of foreign producers thwarting Congressional intent by creating fictitious markets in the United States via arm's length transactions. To do so, a producer would either have to lower the United States price of its merchandise below market value (in which case a greater dumping margin would result) or the producer would have to raise the price above the market value (in which case the producer would have difficulty finding an arm's length buyer). Neither situation presents a problem that would not be adequately addressed by the statute as passed by Congress.

### II. ITA'S USE OF PURCHASE PRICE

Plaintiff challenges ITA's selection of the Purchase Price (PP) rather than the Exporter's sales's price (ESP) methodology in computing United States price (USP).

In determining dumping margins, ITA begins with the actual price at which merchandise is exchanged between unrelated parties. That price is then adjusted through various additions and reductions to work back to an amount, called United States price, which can then be compared with the fair value, that is, foreign market value of the merchandise in the producer's home market, to yield the dumping margin.

As the Court of Appeals for the Federal Circuit has explained:

United States price, as defined in section 1677a, is computed by one of two methods: purchase price or exporter's sales price. The antidumping law attempts to construct value on the basis of arm's length transactions. The arm's length sale takes place at different points in the chain of commerce depending on whether the goods traveled through a related importer or through an independent, unrelated importer. Thus, different methods of computation of United States price are required depending on the relationship of the importer to the foreign producer.

Where the producer is an unrelated, independent party, purchase price is used. Purchase price is the actual or agreed-to price between the foreign producer and the independent importer, prior to the time of importation. Where the importer is related, an arm's length transaction does not occur until the goods are resold to a retailer or to the public. In that case, "exporter's sales price" is used. Exporter's sales price is the price at which the goods are eventually transferred in an arm's length transaction, whether from the importer to an independent retailer or directly to the public.

Both purchase price and exporter's sales price are subject to adjustment in order to derive a "fair" United States price for comparison with foreign market value. The adjustments provided in section 1677a(d) are applicable to both purchase price and exporter's sales price. The additional adjustments provided in section 1677a(e) are applicable *only* to exporter's sales price.

*Smith-Corona Group v. United States,* 713 F.2d 1568, 1572 (Fed.Cir.1983) (footnotes omitted) (emphasis in original), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The additional ESP adjustments referenced by the Court of Appeals are made for certain amounts associated with the sale of merchandise in the United States, typically, commissions for selling the merchandise in the United States, and sales expenses generally incurred in selling the same type of merchandise in the United States.[6] ESP adjustments, by their own terms, only apply where there has been sales activity associated with the sale of the merchandise at issue, or substantially identical merchandise, in the United States. Without these adjustments foreign producers, and their subsidiaries, could compete unfairly in the U.S. market by spending amounts on marketing and selling their products that are in excess of what they spend in their home markets.

To adjust for certain activities in the United States, the ESP calculations start with the actual price involved in the arm's length transaction between the importer and an unrelated purchaser in the United States, and work back to an estimation of

---

**6.** 19 U.S.C. § 1677a(e) provides as follows:

**(e) Additional adjustments to exporter's sales price**

For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—

(1) commissions for selling in the United States the particular merchandise under consideration,

(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, and

(3) any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

the price the producer received for the merchandise. *See Brother Indus., Ltd. v. United States*, 3 CIT 125, 140–41, 540 F.Supp. 1341, 1357 (1982), *aff'd sub nom. Smith-Corona Group*, 713 F.2d at 1568. As Congress explained when it first introduced ESP and these adjustments in 1921: "'exporter's sales price' is defined in such manner as to make the price the net amount returned to the foreign exporter." S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921).

■ In the present case, Rhone France sold the ASM to its related U.S. importer, Rhone U.S. Only the actual price at which Rhone U.S. sold the ASM in the United States will be used in calculating USP. That price, however, must cover Rhone U.S.'s costs involved with selling ASM in the United States. Although Rhone U.S.'s selling expenses have not been verified, Rhone France indicates that such expenses exceed the home market selling expense. [C.R. 1 Section B & C]. Despite the fact that the record has not been developed to provide for ESP adjustments, it is highly likely that the actual price upon which USP is calculated includes various costs involved with selling ASM in the United States, and may include sales commissions. If these are not adjusted for, the resulting USP will not provide an appropriate price for comparison with foreign market value.[7]

---

7. Of course, if no such cost exists, the result should be equivalent to that obtained with the particular kind of PP methodology utilized here. In such a case no prejudice would result from utilization of ESP.

8. Throughout the record and in ITA's arguments to this court, it is apparent that ITA generally interprets sales to unrelated parties that occur prior to importation to automatically satisfy the definition of PP, while being beyond the scope of the definition of ESP.

9. During the relevant dates at issue, the definitions of USP, PP and ESP were defined at 19 U.S.C. § 1677a as follows:
    (a) **United States Price.**
    For purposes of this subtitle, the term "United States price" means the purchase price, or the exporter's sale price, of the merchandise, whichever is appropriate.

## A. STATUTORY DEFINITIONS OF PURCHASE PRICE AND EXPORTER'S SALE PRICE

■ In its final determination, ITA distinguished its application of PP in this review period from its prior application of ESP in the original fair value investigation by stating that "[i]n this review period the sales to the unrelated U.S. customer occurred prior to the date of importation." 49 Fed.Reg. 43733, 43734.[8] The mere fact that a sale was made prior to importation does not provide a sufficient basis for applying PP rather than ESP. While the application of PP is limited to certain transactions that occur "prior to the date of importation," ESP price applies to other transactions that occur either "before or after the date of importation." 19 U.S.C. § 1677a(b) & (c) (1982).[9] Thus, where a sale is made to an unrelated party prior to importation, the determination of whether PP or ESP applies must be based upon additional circumstances.

ITA now distinguishes the transaction at issue from an ESP transaction occurring "before ... the date of importation," by asserting that in this case Rhone U.S. "acted as a mere conduit, or sales agent, for a direct sale of merchandise from Rhone France to [the unrelated U.S. purchaser] for exportation to the United States." Defendant's Response to Court Questions at 3. Whatever the legal merits of ITA's

---

(b) **Purchase price**
For purposes of this section, the term "purchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and adjustments under subsection (d) of this section shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported.
(c) **Exporter's sales price**
For purposes of this section, the term 'exporter's sales price' means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, as adjusted under subsections (d) and (e) of this section.

distinction, its characterization of the transaction at issue is not supported by the record.

There is no reference in the record to any direct contacts or agreements between Rhone France and the unrelated U.S. purchaser. As the verification report on Rhone France summarized, "[t]hroughout these documents, the U.S. customer is recorded as Rhone-Poulenc, Inc. [Rhone U.S.]. There is no mention of the unrelated U.S. customer. Documentation of [Rhone U.S.]'s sale and selling price to the unrelated U.S. customer ... can only be verified at [Rhone U.S.]'s offices in the U.S." [C.R. 7 at 2].[10]

There were two separate transactions in this case. In the first, Rhone U.S. purchased ASM directly from Rhone France, for exportation to the United States. In the second, Rhone U.S. turned around and resold that ASM in the United States, under different terms of sale. Rhone U.S. placed its order for ASM with Rhone France on July 7, 1982. [C.R. 7 Exhibit 1 (Telex, Purchase Order); P.R. 22 at 72; 49 Fed.Reg. 43733, 43734]. That order was confirmed by Rhone France on July 9, 1982. [C.R. 7 Exhibit 1 (Acknowledgment of Order)]. It was not until then, July 9, that the unrelated purchaser actually placed its own order for the ASM with Rhone U.S. [C.R. 9 Exhibit 2–D (Rhone U.S.'s Order Form); C.R. 3 (U.S. buyer's Purchase Order "Confirmation"); P.R. 22 at 72; 49 Fed.Reg. 43733, 43734]. The

price at which the unrelated U.S. purchaser eventually ordered the ASM from Rhone U.S. was different from the price at which Rhone U.S. ordered the ASM from Rhone France. [C.R. 7 Exhibit 1; C.R. 9 Exhibit 2–D; C.R. 3]. There is no indication in the record that Rhone France was involved in actually setting or approving Rhone U.S.'s sale price to the unrelated U.S. purchaser.[11] In fact, even Rhone France considered Rhone U.S. to be a reseller who purchases at one price, and resells at a higher price (rather than a commission earning agent). [C.R. 1 Section B].

ITA argues that there is no statutory requirement, explicit or otherwise, that the importer must be an independent party in order to apply PP, and maintains that the court of appeals "inadvertently mischaracterized the transactions at issue involved in purchase price and exporter's sales price." Defendant's brief at 24. While the statute does not state in so many words that PP and ESP are to be distinguished by the relationship of the foreign producer to the U.S. importer, the statutory definitions of PP and ESP have been distinguished upon this basis from their inception. *See Smith-Corona,* 713 F.2d at 1568; S.Rep. No. 16, *supra,* at 11; *Timken Co. v. United States,* 630 F.Supp. 1327, 1341 (CIT 1986); *Administration of the Antidumping Act of 1921: Hearings Before the Subcomm. on Trade of the House Comm. on Ways and Means,* 95th Cong., 2d Sess., 16 (1978) (Statement of Robert E. Chasen, Commis-

---

10. A memorandum in the file responds to the absence of documentation by stating that "the documents on file at [Rhone France] and examined by the verifying officers would not normally refer to any transaction between [Rhone U.S.] and the unrelated U.S. Customer, especially since [Rhone U.S.] is listed as the importer of record for Customs purposes." [P.R. 42]. The court notes that the Customs Invoice on file at Rhone France required the names of the "CONSIGNEE," and the "BUYER (*if other than consignee*)." Rhone U.S. was listed as the consignee, but the space provided for the buyer was left completely blank. [C.R. 7 Exhibit 1].

11. Apparently, the only portion of the record that appears to support defendant's position is the verifying officer's statement in the report of Rhone U.S. The statement characterizes the

unrelated purchaser as the importer, implies that the unrelated purchaser placed an order on July 7, 1982, that Rhone U.S. did no more than telex the unrelated purchaser's order that same day, and that it was the unrelated purchaser's order which was confirmed by Rhone France. The evidence clearly establishes, however, that Rhone U.S. was the importer of record, [C.R. 4] that it actually placed an order with Rhone France on July 7, 1982, [C.R. 7, Exhibit 1], that Rhone U.S.'s order was acknowledged on July 9, 1982, *id.,* and that on that same day, the unrelated U.S. purchaser ordered the ASM from Rhone U.S., [C.R. 9, Exhibit 2–D (Rhone U.S. [telephone] Order Form) ], and confirmed that order. [C.R. 3]. *See* [P.R. 22 at 72]; 49 Fed. Reg. 43733, 43734.

sioner of Customs); Staff of Senate Comm. on Finance, 90th Cong., 2d Sess., Compendium of Papers on Legislative oversight of U.S. Trade Policies 162 (Comm.Print 1968) (statement of J.P. Hendrick, Special Assistant to Secretary of the Treasury).

The express terms of the statute make it clear that a U.S. importer's relationship to a foreign producer will affect the determination of whether PP or ESP will apply. The definition of "exporter" includes certain related importers, and thereby permits sales by the importer to be imputed to the foreign producer so that ESP will apply. 19 U.S.C. § 1677(13). On the other hand, the statute provides no mechanism for imputing actual sales by an importer to that importer's related "foreign manufacturer or producer of the merchandise," so that PP will apply.

In this case, the importer of record, Rhone U.S., was related to the producer, Rhone France, and falls within the statutory definition of exporter. As a result, the price at which Rhone U.S. sold the ASM to the unrelated buyer was "the price at which merchandise [was] ... sold in the United States, before ... the time of importation, by or for the account of the exporter [Rhone U.S.]" within the meaning of ESP. 19 U.S.C. § 1677a(c). ITA concedes that a single import transaction can not be both an ESP and a PP transaction. Thus, this is not a case where ITA has discretion to apply one or the other methodology to a given set of facts. In any event, the price at which Rhone U.S. sold ASM to the unrelated buyer was *not* "the price at which merchandise [was] ... purchased, prior to the date of importation, *from the manufacturer or producer of the merchandise [Rhone France] for exportation to the United States*" within the meaning of PP. 19 U.S.C. § 1677a(b).

### B. LEGISLATIVE HISTORY OF THE 1979 REVISION

Defendants cite the legislative history to the Trade Agreements Act of 1979 in arguing that Congress intended to allow PP to apply in a situation such as this—where the producer's related U.S. importer sells merchandise to an unrelated U.S. buyer, prior to importation. Even though the meaning of the statutory language appears to be clear, the use of legislative history as an aid to construction of the statute may be proper. *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1975) (citing *United States v. American Trucking Assns.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) (footnotes omitted)).

The legislative history cited by defendants is that of the Trade Agreements Act of 1979, which repealed the Antidumping Act of 1921 and reenacted its provisions as part of the Tariff Act of 1930. In the process, the term "United States price" was introduced into the statute, and the definition of PP was changed. Under the Antidumping Act of 1921, PP had been defined as:

> ... the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, *by the person by whom or for whose account the merchandise is imported* ....

19 U.S.C. § 162 (1976) (emphasis added) (repealed). When it was enacted into the Tariff Act of 1930, PP had been redefined as:

> ... the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, *from the manufacturer or producer of the merchandise for exportation to the United States* ....

19 U.S.C. § 1677a(b) (emphasis added). Congress explained the need for these changes as follows

> The purpose of this modification is to provide statutory authority for the present administrative practice whereby if a producer knew that merchandise was intended for sale to an unrelated purchaser in the United States under the terms of sale fixed on or before the date of importation, the producer's sale price

to an unrelated middleman will be used as the purchase price. Thus, the dicta in *Voss International v. United States* [473 F.Supp. 327], C.D. 4801, (May 7, 1979) is explicitly overruled, and 'purchase price' may be used if transactions between related parties indicate that the merchandise has been sold prior to importation to a U.S. buyer unrelated to the producer. The Committee understands that the executive branch intends to issue regulations, consistent with present practice, under which sales from the foreign producer to middlemen and any sales between middlemen before sale to the first unrelated U.S. purchaser are examined to avoid below cost sales by the middlemen.

H.R.Rep. No. 317, *supra*, at 75; *see also* S.Rep. No. 249, *supra*, at 94; H.R.Doc. No. 153, 96th Cong., 1st Sess. 411–12 (1979), U.S.Code Cong. & Admin.News 1979, at 480.

Defendants make much of Congress' reference to administrative practice and statement that " 'purchase price' may be used if transactions between related parties indicate that the merchandise has been sold

prior to importation to a U.S. buyer unrelated to the producer." To be understood, that statement must be viewed in its full context.

The 1979 amendment of the definition of PP provided statutory authority for a specific administrative practice. That practice, as Congress explained, involved using "the producer's sale price to an unrelated middleman" as the PP, where the producer knows that the merchandise is intended for sale to an unrelated U.S. buyer, prior to importation. H.R.Rep. No. 317, *supra*, at 75; S.Rep. No. 249, *supra*, at 94, U.S.Code Cong. & Admin.News 1979, at 480. It was that practice that was involved in the *Voss* case cited by Congress, and questioned where the producer's sale price to an unrelated middleman was followed by transactions between related parties.[12] Congress made no reference to any practice of applying PP to the price at which the producer's related U.S. importer actually sells to an unrelated buyer. In fact, neither the parties, nor the court, have been able to produce any administrative decisions to demonstrate that such a practice existed at the time of the amendment.[13] To the con-

---

**12.** In *Voss* the Treasury Department sought to use the producer's sale price to an unrelated middleman, where that sale was then followed by a sale to a related middleman, and finally by a sale to an unrelated U.S. purchaser. *Voss International Corp. v. United States*, 82 Cust.Ct. 190, 473 F.Supp. 327 (1979), *rev'd on other grounds*, 67 CCPA 96, 628 F.2d 1328 (1980). Treasury determined that one middleman (the exporter) was the purchaser and that the other middleman (the exporter's U.S. subsidiary) was the importer, and applied PP to the producer's sale price to the unrelated middleman. The court interpreted the existing statutory definition of PP to require that the purchaser and importer be the same person and thus rejected the administration's practice as contrary to law. 473 F.Supp. at 331. Viewed in this context, it is apparent that Congress was concerned that transactions between related middlemen not bar the use of PP where it is otherwise applicable.

The court also interpreted the definition of PP to preclude a purchase where the price is subject to exchange rate adjustments after the time of exportation. This interpretation was "overruled" when the reference to "exportation" was changed to "importation." *See* H.R.Doc. 153, *supra*, at 412. ("Moreover, 'purchase price' may

be used if the price is determined or determinable prior to 'importation' of the merchandise, meaning the date of entry, or withdrawal from warehouse, for consumption.")

**13.** Treasury determinations issued near the time of the 1979 amendment illustrate administrative practices involving the application of PP to: sales between a producer and an unrelated middleman (trading company), *see, e.g., Sorbates from Japan*, 43 Fed.Reg. 26175, 26176 (1978); sales between a producer and the unrelated purchasing agent of a U.S. buyer, *see, e.g., Perchlorethylene from Belgium*, 44 Fed.Reg. 6821 (1979); and sales between a producer and an unrelated U.S. buyer who acted as its own importer. *See, e.g., Saccharin from the Republic of Korea*, 42 Fed.Reg. 46091 (1977). Where PP and ESP were contrasted in a single determination, it became clear that Treasury's practice was not to apply PP where a related importer actually sells merchandise to an unrelated purchaser. *See Steel Wire Strand for Prestressed Concrete from Japan*, 43 Fed.Reg. 38495, 38496 (1978) ("Purchase price . . . was used exclusively for four manufacturers since all sales for export were made to nonrelated customers in the United States. Exporter's sales price . . . was used for those sales in which a related importer acted as the seller of the merchandise.").

trary, after the 1979 Act was passed, both Treasury and ITA acknowledged that the specific administrative practice supported by the new definition of purchase price involved the producer's sale price to an unrelated middleman. 44 Fed.Reg. 59742, 59743 (1979) (Treasury proposed revision of the customs regulations relating to anti-dumping duties); 45 Fed.Reg. 8128, 8184 (1980) (ITA final rule and requests for comments).

■ Apart from the specific response to the problems raised by the *Voss* case, Congress indicated its intention to maintain the principle concepts of PP and ESP under the new law. *See* S.Rep. No. 249, *supra,* at 94 (The 1979 amendment "would generally continue existing law with respect to the meaning of purchase price and exporter's sales price"); and H.R.Doc. No. 153, *supra,* at 410 (1979) ("A new term, 'United States price,' will be used to embrace both the existing terms 'purchase price' and 'exporter's sales price,' the principle concepts of which will also be retained."). The principle distinction between PP and ESP has consistently been interpreted by legislatures and courts to turn on the relationship of the producer to the U.S. importer. *See* discussion, *supra,* at 733. This distinction was not relinquished by Congress' approval of the administrative practice of using the producer's sale price to an unrelated middleman as PP, where the producer knows that the merchandise is intended for sale to an unrelated U.S. buyer. Thus, the distinction survives application of PP to certain situations involving transactions between related middlemen.

ITA cites four of its determinations from 1982 to 1984 and argues that the court should be guided by ITA's construction of the statute, even though the enacting Congress was not presented with such a construction. One of those determinations involved sales to unrelated U.S. importers, where the producer's U.S. subsidiary did not participate directly in the sales. *Sorbital from France,* 47 Fed.Reg. 6459, 6460 (1982) ("Specific Issues of the Investigation"). In all four determinations, however, ITA based its application of PP solely upon the fact that arm's length sales were

made *prior to importation.* Such reasoning renders most of the language used in the definitions of PP, ESP and "exporter" superfluous. Under ITA's construction, PP is expanded to cover all sales made prior to importation, while ESP is limited to sales after importation. This construction ignores all statutory reference to, and definitions of, the various actors as well as the distinctions between purchases "for exportation to the United States," as used in the definition of PP and sales "in the United States," as used in the definition of ESP. In addition, the phrase "before or after the time of importation," as used in the definition of ESP, is construed to refer only to sales "after the time of importation." ITA's construction is neither reasonable nor consistent with Congressional intent.

Application of PP to the case at hand, which clearly falls within the statutory definition of ESP, would abandon the principal concepts that have distinguished PP and ESP since they were first enacted in 1921, render the express terms of the statute meaningless, and disregard the purpose which the additional adjustments for ESP serve in antidumping determinations. In light of the above discussion it is clear that neither the language of the statute, nor its interpretation by the courts, nor its legislative history, nor the overall policy of U.S. antidumping legislation, supports application of PP to the facts of record here, that is, a case where a foreign producer exports, and its U.S. subsidiary imports, merchandise which is sold by the U.S. subsidiary for its own account to an unrelated purchaser prior to importation. Accordingly, the court finds that ITA's application of PP to all pre-importation sales is unreasonable and further, that based on the record before this court, that ITA erred in its determination of USP and remands for recalculation of the dumping margin, pursuant to section 751, 19 U.S.C. § 1675 (1982).

## III. DEPOSITS OF ESTIMATED ANTIDUMPING DUTIES

■ ITA determined in its third administrative review that the 1982 sale of ASM from France was made without a dumping margin. In making this determination,

ITA did not reduce USP by the amount of the deposit of estimated antidumping duty which was posted by Rhone U.S., the importer of record. Plaintiff claims that ITA erred in not reducing USP by the amount of the deposit, even where, but for those deposits, no duty would otherwise be assessed.[14]

Plaintiff argues that under the statute and its implementing regulations, ITA is required to deduct from its calculation of U.S. price the full amount of estimated antidumping duties that Rhone U.S. deposited on the July 1982 entry of ASM. The statute provides that U.S. price is to be reduced by:

> ... the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and *United States import duties*, incident to bringing the merchandise from the place of

shipment in the country of exportation to the place of delivery in the United States;

19 U.S.C. § 1677a(d)(2)(A); 19 C.F.R. § 353.10(d)(2)(i) (emphasis added). It is disputed whether "United States import duties," as used in the calculation of antidumping duties, refers to antidumping duties, either assessed or estimated.[15] There is no dispute, however, that the regulations provide for the deduction from U.S. price for:

> ... the amount of any antidumping duties which are, or will be, paid by the manufacturer, producer, seller, or exporter, or which are, or will be, refunded to the importer by the manufacturer, producer, seller, or exporter, either directly or indirectly ...

19 C.F.R. § 353.55 (1982).

Regardless of whether antidumping duties may be deducted from USP under 19

---

**14.** Defendant-intervenor argues that this issue is improperly before the court because it is beyond the scope of plaintiff's complaint, and it was not raised before the ITA. This case involves the failure to raise one purely legal argument, not failure to participate or add factual data to the administrative record, and thus "[i]t is within this court's discretion to determine whether the particular manner of failure to exhaust administrative remedies warrants preclusion of consideration of the new issue." *Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 583 F.Supp. 607 (1984). In this case ITA has not raised an exhaustion challenge. *See Weinberger v. Salfi,* 422 U.S. 749, 767, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975) (interpreting the government's failure to raise exhaustion challenge as a determination by the government that its reconsideration determination is "final"). In fact, defendants stipulated to the amendment of plaintiff's complaint by order of this court to include this issue. The court finds no prejudice to any of the parties (who all stipulated to the amendment of plaintiff's complaint) by allowing this purely legal issue to be raised in this court for the first time. *Rhone Poulenc, supra; Phillip Bros., Inc. v. United States,* 10 CIT ——, ——, 630 F.Supp. 1317, 1319–21 (1986); *American Permac, Inc. v. United States,* 10 CIT ——, ——, 642 F.Supp. 1187, 1188 n. 2 (1986). Furthermore, defendants are not prejudiced here because they have prevailed on this issue. *Phillip Bros.,* 10 CIT at ——, 630 F.Supp. at 1324 n. 11; *American Permac, Inc.,* 10 CIT at ——, 642 F.Supp. at 1188 n. 2.

**15.** In an early case holding that antidumping duties were additional duties, rather than penal-

ties subject to due process requirements, the court concluded that "Congress desired and intended that the additional duties provided for in [the 1921 Antidumping Act] should be considered as duties for all purposes." *C.J. Tower & Sons v. United States,* 21 CCPA 417, 428, 71 F.2d 438, 445 (1934) (interpreting the precursor to 19 U.S.C. § 1673i (1982), current version at 19 U.S.C. § 1677h (Supp. III 1985)). Another case noted that "... 19 U.S.C. 160–162 [ (1976) (repealed 1979) ] ... makes it clear that in calculating purchase price or exporter's sales price there shall be deducted the amount of any special dumping duties which are, or will be, paid by the manufacturer, producer, seller or exporter, or which are, or will be, refunded to the importer by the manufacturer, producer, seller or exporter, directly or indirectly." *Pasco Terminals, Inc. v. United States,* 76 Cust.Ct. 204, 207, 416 F.Supp. 1242, 1244 (1976), *rev'd on other grounds,* 65 CCPA 28, 567 F.2d 976 (1978).

It is noteworthy that antidumping provisions in other jurisdictions explicitly list antidumping duties as one of the adjustments to be made in constructing prices. Council Regulation (EEC) No. 3017/79 Article 2(8)(b)(ii), *reprinted in* J. Cunnane & C. Stanbrook, *Dumping and Subsidies* 138 (1983). As one commentator has stated: "[t]he reason for this is that if antidumping duties were not deductible in the construction of export prices an importer who was associated with an exporter who had been found to have been dumping could continue to resell the imported products at prices which had led to the finding of dumping or, at least, not pass on the full extent of the antidumping duty. This would clearly make a nonsense of the antidumping duty." *Id.* at 36.

U.S.C. § 1677a(d)(2)(A), as United States import duties included in the price of merchandise, or only under 19 C.F.R. § 353.55, as antidumping duties paid or reimbursed by the manufacturer, producer, seller, or exporter, ITA determined that no antidumping duties were to be assessed in this case, and thus it declined to make any adjustments under either the statute or the regulation.

Under the Tariff Act of 1930, deposits of estimated antidumping duties must be posted for merchandise that is subject to an antidumping duty order. The amounts of these deposits are based upon past determinations of dumping margins involving previous entries. The amount of the actual antidumping duty that is eventually assessed on an entry of merchandise may vary significantly from the amount of estimated antidumping duties initially deposited on that entry. The difference between the deposit of estimated antidumping duties, and the actual assessed antidumping duties is either collected, or refunded with interest. *See* 19 U.S.C. § 1673f; 19 U.S.C. § 1677g; S.Rep. No. 249, *supra*, at 77.

The requirement of depositing estimated dumping duties was intended as a means of deterring dumping and speeding up the assessment of antidumping duties, but not of unduly burdening importers who have taken steps to eliminate dumping. H.R. Rep. No. 317, *supra*, at 69. ITA has been careful in its implementation of the Act not to allow the amount of estimated antidumping duties, based upon *past* dumping margins, to alter its determination of *present* dumping margins. If deposits of estimated antidumping duties entered into the calculation of present dumping margins, then

those deposits would work to open up a margin where none otherwise exists.

Accordingly, ITA states that its practice regarding adjustments for antidumping duties is as follows. First, ITA makes an initial determination of whether the merchandise at issue is being sold in the U.S. at less than fair value.[16] If merchandise is being sold at less than fair value, then the amount of that difference—the dumping margin—eventually will be the basis for an actual assessment of antidumping duties. Only at that point, while the merchandise is still in liquidation, does ITA apply 19 C.F.R. § 353.55 by determining what amount, if any, of the antidumping duties to be assessed "are or will be paid ... [or] ... refunded to the importer by the manufacturer, producer, seller or exporter." The amount "paid" or "refunded" is based on the antidumping duties *to be assessed,* not on the prior deposit of estimated antidumping duties. Thus, if a producer agrees to reimburse all antidumping duties, then the entire amount of antidumping duties to be assessed will be added in determining the dumping margin pursuant to 19 C.F.R. § 353.55, regardless of whether a larger or smaller deposit of estimated antidumping duties has been posted.

It was not improper for ITA to not make any adjustments under 19 C.F.R. § 353.55 or 19 U.S.C. § 1677a(d)(2)(A) for *deposits* of estimated antidumping duties paid by Rhone U.S. Because ITA found no margin, there were no *actual* duties to deduct. The determination upon remand, however, may result in a finding of dumping, in which case the separate issue of whether actual duties should be deducted in calculating final margins may arise.[17]

**16.** Congress recognized the need for using general concepts such as fair value prior to the actual determination of statutorily defined values. *See,* H.R.Rep. 317, *supra,* at 59 ("The provision retains the concept of "fair value" for purposes of the investigative phase of an antidumping proceeding. The term fair value is not defined in current law nor in the bill. The Committee intends the concept to be applied essentially as an estimate of "foreign market value" during the period of investigation so as

to provide the Authority with greater flexibility in administration of the law.").

**17.** ITA implies that 19 C.F.R. § 353.55 may be somewhat punitive and that application of the regulation would be inappropriate here where duties are paid by Rhone U.S., the entity with a direct obligation under U.S. law for the duties. Plaintiff's view of ITA's position on this point is unclear. If this issue arises, it would be helpful if on remand ITA would explain its interpretation of § 353.55 and relate it to 19 U.S.C.

## IV. WEIGHTED AVERAGING OF FOREIGN MARKET VALUE

In conducting its annual administrative review, ITA is required to determine the foreign market value of the July 1982 entry of ASM, and determine the amount, if any, by which the foreign market value of that entry exceeds its United States price. 19 U.S.C. § 1675(a)(2) (1982). ITA determined foreign market value by using a weighted average of sales made by Rhone France during July 1982. The use of a monthly weighted average was explained by ITA in the notice of final results as follows:

> When during a month, as here, there are numerous home market sales of identical merchandise at varying prices, it is appropriate to use the monthly weighted-average of those home market prices. Accordingly, we have based foreign market value on the weighted-average home market price of all sales of identical merchandise ... sold in July 1982 and invoiced in August 1982....

49 Fed.Reg. 43733, 43735 (1984). The use of weighted averaging in cases involving varying prices has been provided for by regulation since 1955. T.D. 53773, 90 Treas.Dec. 93, 96 (1955) (Treasury Regulation Adopted under Antidumping Act of 1921); 19 C.F.R. § 353.20 (1982) (ITA Regulation under Tariff Act of 1930). Averaging has also been provided for by the Tariff Act of 1930 in cases involving a significant number of sales. 19 U.S.C. § 1677b(f) (1982); 19 U.S.C. § 1677–1 (Supp. III 1985).

Plaintiff does not challenge ITA's power to use weighted averages, or even monthly weighted averages, in this particular case. Plaintiff does, however, object to the time period used to compute the monthly weighted average. Plaintiff argues that the monthly period must be limited to "the 30 day period *prior* to the exportation or sale date of the involved entry—*not in any part subsequent thereto.*" Thus, plaintiff's position is that ITA exceeded its discretion and authority when it based its monthly weighted average upon the calendar month of July, where the exportation and sales occurred *during* the month of July. Plaintiff's position is based upon the definition of foreign market value, which provides, in part, as follows:

> The foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise ... except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this subtitle no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

19 U.S.C. § 1677b(a)(1).

Apparently, plaintiff's reading of the statute relies heavily upon the references to determining foreign market value "at the time of exportation" or "as of the date of such purchase." These references, taken literally, are to specific points in time, and not to periods prior to or after such times.[18] A strictly literal reading of these references, however, would not allow room for the use of averages, regardless of whether those averages were made over periods prior to, or after, the relevant point in time. Such a reading would be inconsistent with Congress' intent in providing for averages in certain cases, and thirty years of administrative regulations and practice under both the Antidumping Act of 1921 and the Tariff Act of 1930 in other cases.

■ Plaintiff argues that reading the statute to allow weighted averaging over a period of time prior, but not subsequent, to

§ 1677a(d)(2)(A), 19 U.S.C. § 1677(13) and the statutory scheme.

**18.** The phrase "as of" generally refers to a specific time, though it is often used to define a starting point. *Webster's Third New International Dictionary* 129 (1981) provides the following definition for "as of": "at or on (a specific time or date) <the rule takes effect *as of* July 1>."

the time of exportation or date of purchase is necessary to prevent manipulation of foreign market prices. According to plaintiff, basing averages upon a calendar month (extending beyond the time of exportation or date of purchase) gives exporters the opportunity to manipulate foreign market value during the balance of the month. Presumably, such manipulation would have to be made through pretended sales or attempts to create a fictitious market.[19] Such situations, however, are already explicitly provided for in the statutory definition of foreign market price and the regulations. 19 U.S.C. § 1677b(a)(1); 19 C.F.R. § 353.18. Plaintiff's interpretation of the statute is not necessary to effectuate the purpose of the antidumping act, and is not the only reasonable interpretation. While ITA might provide an extra measure of protection against manipulation of foreign market value by basing its weighted monthly averages upon a 30 day period prior to the time of exportation or date of purchase, it is not unreasonable for ITA to base such average upon the calendar month within which an exportation or purchase occurred.

## V. CONCLUSION

The action is remanded for ITA to redetermine the Less-Than-Fair-Value margin, pursuant to its 751 review, 19 U.S.C. § 1675 (1982), in accordance with this opinion. ITA shall file its redetermination with the court within 30 days. Plaintiff will file any comments on the results of the remand within 15 days after the filing of ITA's redetermination, and defendants will respond within 10 days after filing of plaintiff's comments.

SO ORDERED.

---

**19.** If legitimate sales in the foreign market were made without an intention to create a fictitious market, then such sales would not be the type of "manipulation" that Congress intended to address. Dumping practices may be discontinued by either raising U.S. prices or lowering foreign market prices.